# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**MATTHEW J. McGOVERN**
Evansville, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ERIC P. BABBS**
Deputy Attorney General
Indianapolis, Indiana

**FILED**

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| EDWARD LEE JACKSON, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 82A01-1110-CR-00445 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE VANDERBURGH CIRCUIT COURT
The Honorable Kelli E. Fink, Magistrate
Cause No. 82C01-1103-MR-00338

**August 1, 2012**

**OPINION – FOR PUBLICATION**

**MATHIAS, Judge**

Edward Lee Jackson ("Jackson") was convicted in Vanderburgh Circuit Court of murder and attempted murder. Jackson appeals and presents two issues, which we restate as:

> I. Whether the trial court's admission of an autopsy photograph of the victim's heart was unfairly prejudicial; and

> II. Whether the trial court abused its discretion by failing to consider Jackson's willingness to plead guilty to a habitual offender enhancement as a mitigating factor.

We affirm.

## Facts and Procedural History

Jackson and Rosalie Clark Myers ("Rosalie") had an "off and on" relationship for "eight or nine" years. Tr. p. 74. Jackson and Rosalie cohabitated for parts of this time. Tr. p. 75. At some point in February 2011, Jackson was banned from Rosalie's room at the Esquire Inn ("the Inn"), where she resided. Rosalie saw Jackson a couple of times subsequent to Jackson's expulsion from the Inn; however, these meetings occurred "somewhere else." Tr. p. 108.

On the night of March 10, 2011, Jackson came to Rosalie's room at the Inn uninvited. Tr. p. 76. Specifically, Jackson "walked up behind [Rosalie] as [she] was unlocking her door and he came in behind [her]." Id. Kevin Malicoat ("Malicoat"), a friend of Rosalie's and fellow Inn resident, was with Rosalie when Jackson arrived. Tr. p. 77. Rosalie was "scared" by the way that "[Jackson] came up on [her]," but she did not ask Jackson to leave at that time. Id. Jackson spent most of the evening with Rosalie. Tr. p. 79. Malicoat "ran in and out" of the room "all night." Id. During this time,

2

Jackson and Rosalie consumed alcohol, used methamphetamine, and engaged in sexual activity. Tr. pp. 79-80, 117-18, 121-23. The conversation between Jackson and Rosalie during this time was often confrontational and Rosalie exited the room on multiple occasions to "cool off." Tr. pp. 79-80, 131. On one occasion, Rosalie left with Malicoat to take him back to his room. Tr. p. 81.

Shortly after 5:00 a.m. on March 11, 2011, Rosalie returned to her room with David Scott Devine ("Devine"), another friend and Inn resident. Tr. pp. 81-82. When Rosalie questioned Jackson about a second purchase of methamphetamine, Jackson informed her that he had consumed the second purchase in its entirety. Tr. p. 83. An argument ensued and Rosalie informed Jackson "either you leave or I leave." Id.

Jackson then stood up and stabbed Rosalie multiple times. Id. Devine stood up to confront Jackson. Tr. p. 85. Jackson then "turned around and started stabbing [Devine] from behind." Id. Rosalie's neighbor "heard a man screaming . . . [and] a bunch [of] struggling." Tr. p. 329. In addition, the neighbor heard Jackson state "I'll stab you to death mother f**ker." Tr. p. 331. Jackson stabbed Devine twelve times. Ex. Vol. III., State's Ex. 15. p. 1. Rosalie called 911 while Jackson was stabbing Devine. Tr. p. 91; Ex. Vol. III, State's Ex. 11. During the 911 call, Rosalie identified Jackson as the attacker. Id. Jackson then threw the knife on the bed, directed an expletive at Rosalie, and exited Rosalie's room. Tr. p. 99.

The responding officer, Cara Messmer ("Officer Messmer"), arrived at the Inn shortly after 5:30 a.m. She found Rosalie on the bed clenching her chest and covered in blood and Devine dead on the floor next to the bed. Tr. pp. 21-22. Rosalie told Officer

3

Messmer that Jackson was the assailant. Tr. p. 46. Officer Messmer also observed a "switchblade" knife present on the bed. Tr. pp. 48-49. Rosalie was transported to a nearby hospital where she received treatment for her injuries. Tr. p. 89.

Meanwhile, Jeff Kingery ("Officer Kingery"), another patrol officer, "canvassed the area" in search of Jackson. Officer Kingery was informed that Jackson was traveling on a bicycle. Tr. pp. 56-57. When Officer Kingery located Jackson, his t-shirt, arms, and hands were covered in blood. Tr. pp. 59, 64. Officer Kingery ordered Jackson to stop. Id. Jackson failed to comply with the order and Officer Kingery testified that Jackson "saw [Officer Kingery] . . . tr[ied] to evade . . . [cut] back across the street and . . . through a corner of a yard. Tr. pp. 59-60. Officer Kingery disabled Jackson by "knock[ing] [Jackson] off his bicycle . . . and took him into custody." Tr. p. 60.

Devine received stab wounds to his head, neck, chest, abdomen, arm, and shoulder. Ex. Vol. III., State's Ex. 15 p. 1. Specifically, Devine died from a "stab wound to [his] heart." Id. at 2. Devine also suffered multiple other stab wounds, some of which could have been independently fatal. Tr. pp. 226-29, 231.

Rosalie also suffered multiple stab wounds. Id. Specifically, she received a laceration to her liver, cuts to her interior chest wall, a partially collapsed lung, and a cut to her brachial artery. Some of her injuries were potentially fatal. Id. At the time of her admission to the hospital, she had alcohol, methamphetamine, and cocaine in her system. Tr. p. 244.

DNA analysis was performed on samples taken from the knife and clothing of Rosalie, Devine, and Jackson. Tr. pp. 255-56, 270, 287, 307. DNA analysis of the knife

4

handle indicated mixed profiles from which Jackson, Devine, nor Rosalie could be excluded.[1] Analysis of the bloodstained portion of the knife concluded that absent an identical twin, Devine was the source of the "major DNA profile to a reasonabl[e] degree of scientific certainty."[2] Tr. p. 268. Multiple DNA samples from Jackson's clothing matched Devine's DNA profile. Tr. p. 310. The DNA analyst testified that "[she] would expect to find the DNA from the people bleeding mostly." Tr. p. 290.

On March 15, 2011, the State charged Jackson with the murder of Devine and the attempted murder of Rosalie. Appellant's App. p. 2. On April 7, 2011, the State alleged that Jackson was a habitual offender. Id. at 18. A jury trial was held in August 2011. At trial, Jackson claimed and testified that Devine attacked him with the knife and that he stabbed Devine in self-defense. Tr. pp. 406-15, 424. Jackson denied stabbing Rosalie, but also indicated that he never saw Devine stab her. Tr. pp. 424, 450. Also at trial, State's Exhibit 14(K) was admitted into evidence over the objection of the defense. It is a photograph of Devine's heart into which Dr. Griggs inserted a probe to identify the location of the "stab wound into [Devine's] left pumping chamber of [his] heart." Tr. p. 232. Jackson was found guilty of murder and attempted murder. Appellant's App. pp. 40-41. Jackson then pleaded guilty to being a habitual offender.

---

[1] Stating that an individual's DNA cannot be excluded from a sample means that an individual's DNA is neither unequivocally present nor absent given how rare the presence of their alleles are relevant to the remainder of the population. Tr. pp. 266-67.

[2] Scientific certainty refers to the odds (1:330,000,000,000 regarding DNA analysis) that another individual in the general population has the same DNA profile. Heidi Haas of the Indiana State Police Laboratory testified that "it was over 1:330,000,000,000 chance that someone else has [Devine's]" specific DNA profile. Tr. p. 269.

A sentencing hearing was held on September 6, 2011. Sent. Tr. p. 1.[3] The trial court noted the aggravating circumstances it considered in sentencing Jackson: his criminal history; the nature of the crime including multiple victims and wounds; and his flight from the scene of the crime. The trial court also referenced Jackson's undocumented indication of a bipolar condition as a mitigating factor and noted his guilty plea to the habitual offender enhancement. Sent. Tr. pp. 15-18. The trial court imposed concurrent sentences of sixty years for murder and forty years for attempted murder. Sent. Tr. pp. 18-19. The murder sentence was enhanced by thirty years for Jackson's habitual offender status; thus, the total sentence was ninety years. Id. Jackson now appeals.

## I. Admission of Autopsy Photograph

Jackson asserts that the trial court abused its discretion by admitting State's Exhibit 14(K), an autopsy photograph of Devine's heart, into evidence. Specifically, Jackson argues that the purpose of Exhibit 14(K) was to "inflame the jury . . . by showing them a gory photograph of an autopsy." Tr. pp. 213-14.

The admission and exclusion of evidence is within the discretion of the trial court. Corbett v. State, 764 N.E.2d 622, 627 (Ind. 2002). We review the admission of photographic evidence for an abuse of discretion. Id. (citing Byers v. State, 709 N.E.2d 1024, 1028 (Ind. 1999); Amburgey v. State, 696 N.E.2d 44, 45 (Ind. 1998)). An abuse of discretion occurs when the trial court's decision is clearly against the logic and effects of

_____
[3] The court reporter prepared a separately-bound, paginated transcript of the sentencing proceedings.

the facts and circumstances before it. Payne v. State, 854 N.E.2d 7, 17 (Ind. Ct. App. 2006).

Indiana Evidence Rules 401 through 403 govern relevancy of evidence. Relevant evidence is admissible; irrelevant evidence is not. Ind. Evidence Rule 402. Evidence is relevant if it has any tendency to make any "fact that is of consequence to the determination" of the action more or less probable. Ind. Evidence Rule 401. Relevant evidence can be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice." Ind. Evidence Rule 403.

"Generally, photographs that depict a victim's injuries or demonstrate the testimony of a witness are admissible." Ward v. State, 903 N.E.2d 946, 958 (Ind. 2009). "Even gory and revolting photographs may be admissible as long as they are relevant to some material issue or show scenes that a witness could describe orally." Amburgey, 696 N.E.2d at 45. However, manipulation of a corpse leads to concern that the work of a pathologist could be attributed to a defendant. Swingley v. State, 739 N.E.2d 132, 133 (Ind. 2000). Therefore, autopsy photographs that depict the body in an altered state are generally inadmissible. Id. (citing Allen v. State, 686 N.E.2d 760, 776 (Ind. 1997)). See also Loy v. State, 436 N.E.2d 1125, 1128 (Ind. 1982) ("Such a display may impute the handiwork of the physician to the accused assailant and thereby render the defendant responsible in the minds of the jurors for the cuts, incisions, and indignity of an autopsy."). However, situations arise when the manipulation of a corpse is "necessary to demonstrate the testimony given." Corbett, 764 N.E.2d at 627 (quoting Swingley, 739 N.E.2d at 133-34).

7

State's Exhibit 14(K) is an autopsy photograph of Devine's open chest.  In the photo, Dr. Elmer Griggs, the pathologist who performed the autopsy, is using his right hand to grasp the decedent's heart and in his left hand is a metal probe with which he is indicating the stab wound to the heart.  The trial court admitted the exhibit into evidence and found that the exhibit had "relevancy" and "significance" due to its depiction of the cause of death.  Tr. p. 214.  The trial court concluded that the exhibit's "probative value outweighs the prejudicial effect."  Id.

Jackson relies heavily upon Swingley v. State to support his claim that the trial court erred in admitting the autopsy photograph.  In Swingley, the victim died from exsanguination as a result of a cut in the neck.  Swingley, 739 N.E.2d at 133-34.  On appeal, the defendant challenged the admission of three autopsy photographs.  Id. at 133.  Two photographs showed open wounds to the victim's neck; the third depicted the victim's larynx, which had been removed from the body.  Id.

In Swingley, our supreme court found that the first two autopsy photographs were admissible and that the

> record is unclear as to the extent the body was altered so that the wound was open, but even if the body was positioned in such a way as to open the wound more than it was originally, the positioning was necessary to show the extent of the wound and the cause of death.

Id. at 134.  Our supreme court found the third photograph, which showed the "victim's windpipe or larynx removed from the body and lying on a sheet" was "unnecessary" and that "other photographs depicted the extent of the victim's wounds and the cause of his death."  Id.

8

Jackson asserts that State's Exhibit 14(K) is akin to the third, inadmissible picture in Swingley because "the State in this case presented another photograph of the wound depicted on Devine's heart in State's Exhibit 14(K)." Appellant's Br. at 14. We disagree. Rather, the two admissible photographs in Swingley are similar to State's Exhibit 14(K). The pathologist in Swingley testified that he "had opened the wound to show the blood vessels that had been cut (resulting in death)."[4] Swingley, 739 N.E.2d at 134. Similarly, the pathologist who testified in this case stated that State's Exhibit 14(K) was intended to show the cause of death:

| STATE: | You listed, what did you list as the cause of death? |
|---|---|
| DR. GRIGGS: | That he had cardiac arrhythmia . . . due to compression of the heart from blood in the sac around the heart . . . and he was stabbed in the heart, one of the stab wounds actually went into the left ventricle which is the main pumping chamber of the heart and blood rushed out of the heart and it filled the sac around the heart and then that compressed the heart and then it caused the heart to stop beating[.] |
| STATE: | So, it's your expert opinion that one of the wounds in his chest stabbed his heart. |
| DR. GRIGGS: | Yes. |
| STATE: | This is 14k, what does it show? |
| DR. GRIGGS: | This shows his heart . . . and I am holding his heart here and I'm putting this probe into this hole, and this is a hole in the left ventricle, it's a stab wound into the left pumping chamber of the heart. |

---

[4] See also Fentress v. State, 702 N.E.2d 721 (Ind. 1998), where our supreme court held that the probative value of two photographs depicting the victim's skull with the hair and skin pulled away from it outweighed the prejudicial effect. A pathologist testified to the alterations he made and that they were necessary to determine the extent of the victim's injuries.

9

STATE:          With these injuries, can you give us an estimation of how long you would expect somebody to live?

DR. GRIGGS:     Not very long, it would just be a matter of minutes, I think, or less.

Tr. pp. 231-32.

Jackson asserts that State's Exhibit 14(E), an external photograph that depicts the chest wound corresponding to the laceration on Devine's heart, is "the same wound." Appellant's Br. at 15. However, State's Exhibit 14(E) merely shows a stab wound to the victim's chest. It is difficult to differentiate this exhibit from other photographs showing separate stab wounds to Devine's chest. State's Exhibit 14(K) was the only photograph specifically indicating the wound to the heart. Therefore, State's Exhibit 14(K) is not duplicative of other admitted evidence.

Jackson also argues that the autopsy photograph is similar to the improperly admitted photograph in Turben v. State, 726 N.E.2d 1245 (Ind. 2000). In that case, a photograph of "gloved hands manipulating a bloody mass with a probe" that "barely resembles a human form" was improperly admitted by the trial court. Id. at 1247. The victim in Turben was strangled and the "bloody mass" purportedly showed "the victim's head with the skin and bones cut open and peeled back to expose the interior of the victim's neck." Id. In Turben, our supreme court "doubt[ed] the jury was further enlightened concerning the cause of death by viewing this gruesome spectacle" and because the gruesome photograph was only marginally relevant, its prejudicial impact outweighed its probative value. Id.

In this case, State's Exhibit 14(K), coupled with the pathologist's testimony, was detailed, specific, and necessary to demonstrate the testimony given by the pathologist regarding the cause of death. Also, although graphic, State's Exhibit 14(K) clearly depicts both the victim's heart and the stab wound and clearly resembles a human form. The trial court was within its discretion in determining that the probative value of this evidence outweighed its prejudicial effect.

However, even if we were to conclude that the trial court abused its discretion by improperly admitting evidence, we will only reverse if "the error is inconsistent with substantial justice" or if "a substantial right of the party is affected." Payne, 854 N.E.2d at 17; see also Combs v. State, 895 N.E.2d 1252, 1258 (Ind. Ct. App. 2008), trans. denied. If a conviction is supported by substantial independent evidence of guilt which satisfies the reviewing court that there is no substantial likelihood the challenged evidence contributed to the conviction, the error is harmless. Morales v. State, 749 N.E.2d 1260, 1267 (Ind. Ct. App. 2001). "Harmlessness is ultimately a question of likely impact of the evidence on the jury." Combs, 895 N.E.2d at 1258 (quotation omitted).

Under this standard of review, even if State's Exhibit 14(K) was improperly admitted, the error would be harmless, because the conviction is supported by such substantial evidence of guilt that there is no substantial likelihood that it contributed to the conviction. Rosalie testified in court that Jackson was her attacker and indicated the same during the 911 call. Rosalie's neighbor heard Jackson state that he would stab Devine to death. Devine and Rosalie had multiple stab wounds, but Jackson was

11

uninjured aside from an apparent nick to his finger. Jackson fled from the scene. Thus, any error in the admission of State's Exhibit 14(K) was, at worst, harmless error.

## II. Sentencing

The trial court sentenced Jackson to sixty years for Count I (murder) and forty years for Count II (attempted murder).[5] Sent. Tr. p. 18. The sentences were ordered to be served concurrently. The trial court identified the following aggravating circumstances: Jackson's criminal history, his flight from the scene, and multiple stab wounds and victims. The court also considered Jackson's bipolar condition as a mitigating factor, and "not[ed] the defendant's plea of guilty on . . . the [e]nhancement." Sent. Tr. pp. 17-18. Additionally, the trial court imposed a thirty-year habitual offender enhancement on Count I.[6] Therefore, the aggregate sentence was ninety years. Jackson appeals his sentence and argues that the trial court abused its discretion when it failed to consider his willingness to plead guilty to the habitual offender enhancement as a significant mitigating factor.

Sentencing decisions are within the sound discretion of the trial court and are reviewed only for abuse of discretion. Amalfitano v. State, 956 N.E.2d 208, 211 (Ind. Ct. App. 2011), trans denied. An abuse of discretion occurs when a trial court's sentencing decision is "clearly against the logic and effect of the facts and circumstances before the

---

[5] "A person who commits murder shall be imprisoned for a fixed term of between forty-five (45) and sixty-five (65) years, with the advisory sentence being fifty-five (55) years." Ind. Code § 35-50-2-3. "A person who commits a Class A felony shall be imprisoned for a fixed term of between twenty (20) and fifty (50) years, with the advisory sentence being thirty (30) years." Ind. Code § 35-50-2-4. Attempted murder is a Class A felony. Ind. Code § 35-41-5-1.

[6] See Fentress v. State, 702 N.E.2d 721 (Ind. 1998) ("The legislature has fixed the habitual enhancement for murder at 30 years."); Ind. Code §§ 35-50-2-3, -8.

court, or the reasonable, probable, and actual deductions to be drawn therefrom." Anglemyer v. State, 868 N.E.2d 482, 490 (Ind. 2007) (quoting In re L.J.M., 473 N.E.2d 637, 640 (Ind. Ct. App. 1985)). The trial court must enter a statement that includes the reasons for imposing a sentence. Id. at 491. If the statement indicates mitigating or aggravating circumstances, the court must identify those circumstances it finds significant and "explain why each circumstance has been determined to be mitigating or aggravating." Id. at 490.

A trial court abuses its discretion if it (1) does not "enter a sentencing statement[,]" (2) enters "a sentencing statement that explains reasons for imposing a sentence—including a finding of aggravating and mitigating factors if any—but the record does not support the reasons," (3) enters a statement that "omits reasons that are clearly supported by the record and advanced for consideration," or (4) considers reasons that "are improper as a matter of law." Id. at 490-91.

The trial court does not abuse its discretion by declining to find alleged mitigating factors that are "highly disputable in nature, weight, or significance." Rawson v. State, 865 N.E.2d 1049, 1056 (Ind. Ct. App. 2007), trans denied. And "[t]he relative weight or value assignable to reasons properly found or those which should have been found is not subject to review for abuse" of discretion. See Anglemyer, 868 N.E.2d at 491.

A guilty plea can be a significant mitigating factor when the State reaps a substantial benefit from the defendant's act of pleading guilty; this act conserves the State's resources and relieves the victim's family of the pain associated with trial. Cloum v. State, 779 N.E.2d 84, 89-90 (Ind. Ct. App. 2002). Jackson, while admitting to a legal

13

status, did not accept responsibility for the crime. His guilty plea to his habitual offender status was subsequent to his murder trial; therefore, his guilty plea did not provide the same benefits to the State and victims as would a guilty plea to the underlying crime. In this case, Jackson's admission only relieved the State of its burden of proving the nature and chronology of Jackson's prior convictions, a burden that involves far fewer resources than a murder trial. In addition, the trial court specifically noted Jackson's willingness to admit his habitual offender status as a factor it would consider in sentencing. Sent. Tr. p. 15. Because the weight assigned to this factor is not reviewable for an abuse of discretion, see Gellenbeck, 918 N.E.2d at 712 (citing Anglemyer, 868 N.E.2d at 491), appellate review of the weight assigned to this factor would invade the trial court's discretion, which we will not do.

## Conclusion

The trial court acted within its discretion in determining that the probative value of State's Exhibit 14(K) outweighed its prejudicial effect. Moreover, any error in the admission of this exhibit was harmless. The trial court did not abuse its sentencing discretion when considering Jackson's guilty plea to the habitual offender allegation.

Affirmed.

VAIDIK, J., and CRONE, J., concur.

14