## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 05 2015, 8:08 am

*Kevin S. Smith*

CLERK
of the supreme court,
court of appeals and
tax court

| ATTORNEY FOR APPELLANT | ATTORNEYS FOR APPELLEE |
|---|---|
| Amanda O. Blackketter<br>Blackketter Law Office<br>Shelbyville, Indiana | Gregory F. Zoeller<br>Attorney General of Indiana<br><br>Eric P. Babbs<br>Deputy Attorney General<br>Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Harold W. Reynolds,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff* | June 5, 2015<br><br>Court of Appeals Case No.<br>73A01-1407-CR-314<br><br>Appeal from the Shelby Superior Court<br>The Honorable Jack A. Tandy, Judge<br>Cause No. 73D01-1401-FC-7 |

**Bailey, Judge.**

# Case Summary

Harold W. Reynolds ("Reynolds") appeals his conviction and sentence for Burglary, as a Class C felony.[1]  We affirm.

# Issues

Reynolds presents three issues for review, which we restate as:

I.   Whether the trial court properly denied Reynolds's request to instruct the jury on criminal trespass as a lesser included offense of burglary;

II.  Whether the trial court abused its discretion when it admitted into evidence two photographs depicting a hole in the side of a Quonset hut; and

III. Whether the trial court abused its discretion when it found no mitigating factors that would affect Reynolds's sentence.

# Facts and Procedural History

On Sunday, January 26, 2014, at approximately 3:00 a.m., Morristown Police Department Chief Henry Albrecht ("Officer Albrecht") overheard a Shelby County Sheriff's Department dispatch about a suspected burglary in progress at Integrity Metals, a scrap metal recycling facility located on seventeen acres in

---

[1] Ind. Code § 35-43-2-1.  Due to substantial revisions to the Indiana Code effective July 1, 2014, this offense is now a Level 5 felony.  Throughout this opinion, we refer to the versions of the statutes in effect at the time of Reynolds's offense.

Shelby County. The dispatch indicated that three men were walking through the facility and rummaging in vehicles parked on the property. Integrity Metals was not open for business on Sundays at 3:00 a.m., and owner Joshua Carter ("Carter") had not given anyone permission to access the property at that time. A ten-foot-high privacy fence surrounded the property and the fence gate was locked with a padlock whenever the business was closed. The police were alerted to the unusual activity by Watchdog Security, a company that Carter had hired to install and monitor a virtual recognition camera security system. A sign posted on the fence stated that video surveillance was used on the premises.

[4] Officer Albrecht drove to the property and observed a white truck with expired temporary plates parked partially in a ditch just outside the entrance gate. The officer stopped and parked. After retrieving from the trunk of his squad car an AR-15 rifle equipped with a flashlight, Officer Albrecht approached the truck to see if it was occupied. As he approached, he observed a man, later identified as Reynolds, inside the gate standing next to a running forklift from which he had just alighted. Officer Albrecht pointed the rifle and flashlight at Reynolds, identified himself, and ordered Reynolds to put his hands up. Reynolds initially complied, but then turned and ran.

[5] Outnumbered by the three men reportedly inside the property, Officer Albrecht waited for back-up to arrive. Officer Eric Fields ("Officer Fields"), a canine handler from the Greenfield Police Department, was one of the responding officers. Approximately two hours after Officer Albrecht first encountered

Reynolds, Officer Fields and two other canine officers tracked the suspects to a drainage ditch outside the property. The men were huddled together in the freezing water. Officer Fields deployed his dog to detain the suspects. All three men were placed under arrest and transported to the hospital for treatment for weather-related injuries. Reynolds was also treated for a dog bite.

[6] Meanwhile, Carter, who had received calls from Watchdog Security and Officer Albrecht, arrived at the front gate. Carter saw that the snow was disturbed around a section of fence that crossed over a shallow ditch and left a gap under the fence. The padlock that usually secured the gate was missing. The forklift was not where it was parked the night before, but was running right by the gate.

[7] After the suspects were in custody, Officer Albrecht and Carter walked through the property together. Carter saw that a "pretty big gash" (Tr. 231), large enough that "you could walk through" (Tr. 232), had been cut in the side of the Quonset hut that housed Integrity Metals's non-ferrous scrap metal buying operation. The hut stored metal purchases with a "higher dollar value." (Tr. 235.) The door to the Quonset hut was open, and Carter could see that some things were out of place, including three boxes of copper on the ground. In addition, vehicle tracks in the snow indicated that the forklift had been driven around a loader truck that Carter typically parked in front of the Quonset hut entrance "to make sure that people have a difficult time trying to get things out of there." (Tr. 234.)

[8] After obtaining a warrant, Officer Albrecht searched the white truck found at the scene. Inside, he found a current license plate for the truck and registration indicating that Reynolds was the owner. He also found two bolt cutters, tin snips, a pair of hand-held radios, and numerous receipts for the sale of metal. The next day, Officer Albrecht returned and found the gate padlock on the ground near where the truck had been parked; the lock had been cut in two. A check of the computer system on which Integrity Metals tracked all scrap metal buys using the seller's driver's license number revealed that Reynolds sold scrap metal to Integrity Metals on January 23, 2014, three days before the incident. Reynolds also sold copper and iron to Integrity Metals on October 13 and 16, 2012.

[9] On January 27, 2014, the State charged Reynolds with Burglary, as a Class C felony, Attempted Theft, as a Class D felony,[2] and Resisting Law Enforcement, as a Class A misdemeanor.[3] The State also alleged Reynolds to be a Habitual Offender.[4]

[10] Reynolds's jury trial commenced on May 27, 2014. At the close of the State's evidence, Reynolds moved under Trial Rule 50 for judgment on the evidence as

---

[2] I.C. § 35-43-4-2(a). This offense is now either a Class A misdemeanor or a Level 5 or 6 felony.

[3] I.C. § 35-44.1-3-1(a)(1). The charging information erroneously titled the offense "Fleeing Law Enforcement" and cited Indiana Code section 35-44-3-3, a previous version of the Resisting Law Enforcement statute that was repealed on July 1, 2012. *See* Pub. L. No. 126-2012, § 53.

[4] I.C. § 35-50-2-8.

to the Resisting Law Enforcement charge, which the trial court granted.[5] On May 28, 2014, the jury returned guilty verdicts on the Burglary and Attempted Theft charges. Reynolds then admitted to being a Habitual Offender. On June 25, 2014, the trial court found that the Burglary merged with Attempted Theft and entered a judgment of conviction on the Burglary charge. The court also found Reynolds to be a Habitual Offender. Reynolds was sentenced to six years in the Indiana Department of Correction ("DOC") for Burglary, enhanced by twelve years due to the Habitual Offender determination. Reynolds now appeals his conviction and sentence.

# Discussion and Decision

## Lesser Included Offense

[11] Reynolds first argues that the trial court erred when it refused his request to instruct the jury on criminal trespass as a lesser included offense of burglary.

[12] When a party asks the trial court to instruct the jury on a lesser included offense of the crime charged, the court must engage in a three-step analysis: (1) determine whether the lesser offense is *inherently* included in the crime charged; (2) if not inherently included, determine whether the lesser offense is *factually* included in the crime charged; and (3) if the alleged offense is either inherently

---

[5] The charging information alleged that Reynolds committed the offense on September 24, 2006, a fact not corrected by the prosecution before or during trial.

or factually included, determine whether a serious evidentiary dispute exists whereby the jury could have concluded that the lesser offense was committed but not the greater. *Hauk v. State*, 729 N.E.2d 994, 998 (Ind. 2000) (citing *Wright v. State*, 658 N.E.2d 563, 566-67 (Ind. 1995)).

[13] Reynolds concedes that criminal trespass is not an inherently lesser included offense of burglary, but argues that, in this case, criminal trespass is a factually lesser included offense.

[14] To determine whether the lesser offense is factually included in the charged crime, the court compares the statute defining the alleged lesser included offense with the charging instrument in the case. *Wright*, 658 N.E.2d at 567. If the charging instrument alleges that the means used to commit the crime charged include all of the elements of the lesser offense, then the lesser offense is factually included. *Id.* Thus, we must compare the charging instrument in this case to the statute defining criminal trespass and determine whether the information charging Reynolds with burglary alleged all of the elements of criminal trespass.

[15] The charging information alleged that "Reynolds did knowingly or intentionally break and enter the building or structure of Integrity Metals, with the intent to commit the felony of theft therein, and/or he did aid, cause or induce another to do the same[.]" (App. 31.) Criminal trespass is defined, in relevant part, as follows:

> (a) A person who:

> (1) not having a contractual interest in the property, knowingly or intentionally enters the real property of another person after having been denied entry by the other person or that person's agent;
>
> [. . . ]
>
> commits criminal trespass, a Class A misdemeanor.

I.C. § 35-43-2-2(a)(1). Thus, a person commits criminal trespass when he or she (1) knowingly or intentionally enters the real property of another, (2) after having been denied entry by the other person or that person's agent, (3) not having a contractual interest in the property.

[16] On its face, then, the statutory definition of criminal trespass contains two elements not found in the charging information: (1) denial of entry, and (2) lack of a contractual interest in the property. Reynolds argues that by charging that he did "break and enter" the property, the State sufficiently alleged denial of entry and lack of a contractual interest, such that the charging information alleged all of the elements of criminal trespass.

[17] Our supreme court confronted a similar issue in *J.M. v. State*, 727 N.E.2d 703 (Ind. 2000). In that case, J.M., a minor, was alleged to have committed residential burglary, as a class B felony when committed by an adult, and the State charged that he "did knowingly or intentionally break and enter the building or structure of Marvin Parks, which building or structure was a residence, . . . with the intent to commit a felony there, that is: theft." *Id.* at 705. J.M. was adjudicated delinquent of criminal trespass as a lesser included offense of burglary, which on appeal J.M. argued was erroneous. *Id.* at 704. The residential criminal trespass statute at issue in *J.M.* required the State to

show that J.M. (1) knowingly or intentionally entered the dwelling of another person, (2) without the other person's consent, (3) not having a contractual interest in the property. *Id.* at 705 (citing I.C. § 35-43-2-2(a)(5)). J.M. argued that "without consent" and "not having a contractual interest in the property" were elements of criminal trespass not included in the charging information. *Id.* However, the court held that "by charging that J.M. did knowingly or intentionally 'break and enter' the residence of another person, the State sufficiently alleged facts constituting criminal trespass to support the finding of the magistrate and the judgment of the trial court." *Id. See also Higgins v. State*, 783 N.E.2d 1180, 1188-89 (Ind. Ct. App. 2003) (holding that criminal trespass was a factually included lesser offense of residential entry where (1) residential criminal trespass included the elements of absence of consent and lack of a contractual interest, and (2) the State alleged that the defendant did knowingly "break and enter" the victim's dwelling), *trans. denied*.

[18]   The criminal trespass statute under which J.M. was adjudicated a delinquent and the criminal trespass statute at issue in this case both contain the element of "not having a contractual interest in the property." *See* I.C. §§ 35-43-2-2(a)(5), 35-43-2-2(a)(1). However, where the statute in *J.M.* defined residential criminal trespass as entry "without consent," I.C. § 35-43-2-2(a)(5), the statute under which Reynolds sought an instruction requires a showing that Reynolds entered "after having been denied entry by the other person or that person's agent." I.C. § 35-43-2-2(a)(1). Citing *J.M.*, Reynolds argues that the allegation of "'breaking and entering' implies that he had been denied entry, just as our

courts have found that it implies the lack of consent . . . ." (Appellant's Br. 9-10.)

[19] We disagree. As used in the statute, "denied entry" means:

> (b) A person has been denied entry under subdivision (a)(1) of this section when the person has been denied entry by means of:
>
>> (1) personal communication, oral or written;
>>
>> (2) posting or exhibiting a notice at the main entrance in a manner that is either prescribed by law or likely to come to the attention of the public; or
>>
>> (3) a hearing authority or court order under IC 32-30-6 [nuisance actions], IC 32-30-7 [actions for indecent nuisances], IC 32-30-8 [actions for drug nuisances], IC 36-7-9 [unsafe building law], or IC 36-7-36 [abatement of vacant structures and abandoned structures].

I.C. § 35-43-2-2(b). The statutory definition indicates that to deny entry means to take active steps to communicate that a person may not enter that property. To "deny entry" to a person thus requires more than a mere absence of consent. *See Smithley v. State*, 582 N.E.2d 903, 904 (Ind. Ct. App. 1991) (holding that entry is not denied under Indiana Code section 35-43-2-2(b) and entering another's real property "without consent" does not constitute criminal trespass unless visible signs denying entry are posted, denial of entry has been personally communicated, or a request to leave is made). Nothing in the record indicates that Integrity Metals communicated that Reynolds was denied entry to the property.

[20] Reynolds contends, however, that a sign posted on Integrity Metals's fence "implies a denial of entry[.]" (Appellant's Br. 10.) The sign, posted on the

fence next to the entrance gate, read: "SECURITY NOTICE VIDEO SURVEILLANCE IN USE ON THESE PREMISES." (Ex. 6.) Although the sign alerts the public that Integrity Metals uses a video surveillance system, the text of the sign does not explicitly deny a person entry to the property. Nor does the sign implicitly deny entry simply because it may act as a deterrent to prospective burglars. Furthermore, we are not persuaded by Reynolds's argument that the sign implicitly denies entry "when coupled with the evidence at trial showing that Integrity Metals'[s] property was surrounded by a ten foot privacy fence, and the business was closed with a locked gate when Reynolds allegedly entered it." (Appellant's Br. 10.) A secured building does not affirmatively deny a person entry within the meaning of Indiana Code section 35-43-2-2(b). *See Smithley*, 582 N.E.2d at 904 (locked doors and boarded windows do not constitute denial of entry). The addition of a sign that does not explicitly deny a person entry to the property does not change the calculus.

[21] Because the charging information in this case did not allege all of the elements of criminal trespass, criminal trespass is not a factually included lesser offense of burglary as charged.[6] Accordingly, the trial court did not err in refusing Reynolds's requested instruction.

---

[6] Because criminal trespass is neither an inherently nor factually lesser included offense of burglary in this case, we need not reach part three of the test. *See Wright*, 658 N.E.2d at 567 ("If the alleged lesser included offense is neither *inherently* nor *factually* included in the crime charged, then the trial court should not give a requested instruction on the alleged lesser included offense.").

## Admission of Photographs

[22] Reynolds next argues that the trial court abused its discretion when it admitted into evidence two photographs depicting the hole in the Quonset hut. The admission of photographic evidence is reviewed for an abuse of discretion. *Knapp v. State*, 9 N.E.3d 1274, 1281 (Ind. 2014), *cert. denied*. When photographs are used as demonstrative evidence – that is, as visual aids that assist in the presentation and interpretation of testimony – it must first be shown that the photographs are a true and accurate representation of the things they are to portray. *Smith v. State*, 491 N.E.2d 193, 195 (Ind. 1986) (citing *Brumfield v. State*, 442 N.E.2d 973, 975 (Ind. 1982)). An adequate foundation exists when a supporting witness testifies that the photographs accurately depict the scene or occurrence as it appeared at the time in question. *Id.*

[23] Officer Albrecht took the photographs of the hole in the side of the Quonset hut on May 26, 2014, four months after the burglary. At trial, Carter testified that, with the exception of some tape he applied in an unsuccessful attempt to close the hole and the fact that there was no snow on the ground in May, the photographs accurately depicted the hole as it appeared on January 26, 2014. Later, when the State offered to introduce the photographs into evidence, Officer Albrecht also testified that, except for the tape marks and lack of snow, the photographs accurately depicted the hole on the night of the burglary. On cross-examination, however, Officer Albrecht admitted that he did not measure the hole on either January 26 or May 26, 2014, so he could not say if exact

measurements of the hole changed. Over Reynolds's objection, the trial court admitted the photographs.

[24] On appeal, Reynolds argues that Officer Albrecht's testimony provided an insufficient foundation to admit the pictures, pointing specifically to the officer's response on cross-examination. Even though Officer Albrecht admitted that he did not take specific measurements of the cut, he consistently testified – before and after the cross-examination – that, except for the tape and snow, the photographs accurately depicted the hole as it appeared on the night of the burglary. This was an adequate foundation, and any remaining uncertainty about the exact hole size goes to the weight of the photographs, not their admissibility. *See Knapp*, 9 N.E.3d at 1281 (holding that uncertainty about the date and time photographs were taken, where accuracy of the data depended on whether the camera's time and date were set correctly, affected their weight, not admissibility.)

[25] Moreover, even if the trial court erred in admitting the two photographs, we would find the error harmless. Errors in the admission or exclusion of evidence are disregarded as harmless error, unless they affect the substantial rights of the party. Ind. Trial Rule 61; *Corbett v. State*, 764 N.E.2d 622, 628 (Ind. 2002). "To determine whether an error in the introduction of evidence affected the appellant's substantial rights, this Court must assess the probable impact of that evidence upon the jury." *Corbett*, 764 N.E.2d at 628. Here, Carter had already testified, without reference to the photographs, that after the burglary he discovered a "pretty big gash" in the Quonset hut (Tr. 231), large enough that

"you could walk through." (Tr. 232.) He also described the hole as a "walk through door." (Tr. 231-32.) The photographs merely illustrated the substance of Carter's testimony regarding the size of the hole.

[26] Reynolds argues, however, that the error could not be harmless because "the pictures of the Quonset hut not only influenced the jury to find that [he] 'broke and entered' the Quonset hut, but it is likely that the pictures also convinced the jury that [he] intended to commit theft on the premises." (Appellant's Br. 16.) However, the jury had before it other evidence of breaking and entering; for example, the cut padlock gate and open fence. In addition, there was ample evidence of intent to commit theft, including that the doors to the Quonset hut (which Reynolds knew housed valuable metals because he had previously sold scrap there) were opened, boxes containing copper scrap had been moved, and the forklift had been driven out of its position blocking the hut entrance. Because the photographs likely had minimal impact on the jury's verdict, the probable impact of their admission did not affect Reynolds's substantial rights, and any error in admitting them must be disregarded as harmless.

## Sentencing

[27] Reynolds next contends that the trial court abused its discretion by failing to identify two mitigating factors when imposing his sentence.

[28] Sentencing decisions rest within the sound discretion of the trial court and are reviewed only for an abuse of discretion. *Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218 (Ind. 2007). An abuse of

discretion occurs if the decision is clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom. *Id.* (citation and quotation marks omitted). Trial courts must enter a sentencing statement whenever imposing a sentence for a felony offense, and the statement must include a reasonably detailed recitation of the court's reasons for imposing a particular sentence. *Id.* "If the recitation includes a finding of aggravating or mitigating circumstances, then the statement must identify all significant mitigating and aggravating circumstances and explain why each circumstance has been determined to be mitigating or aggravating." *Id.*

[29] A trial court abuses its discretion if it (1) does not enter a sentencing statement, (2) enters a sentencing statement that explains reasons for imposing a sentence – including a finding of aggravating and mitigating factors if any – but the record does not support the reasons, (3) enters a statement that omits reasons that are clearly supported by the record and advanced for consideration, or (4) considers reasons that are improper as a matter of law. *Jackson v. State*, 973 N.E.2d 1123, 1130 (Ind. Ct. App. 2012) (citing *Anglemyer*, 868 N.E.2d at 490–91), *trans. denied*. "An allegation that the trial court failed to identify or find a mitigating factor requires the defendant to establish that the mitigating evidence is both significant and clearly supported by the record." *Anglemyer*, 868 N.E.2d at 493.

[30] On June 25, 2014, the trial court sentenced Reynolds to six years for the Burglary conviction, enhanced by twelve years due to the Habitual Offender

determination. The court found as aggravating circumstances Reynolds's substantial criminal history, history of probation violations, and the fact that he was on probation at the time of the instant offense. The court found no mitigating circumstances. Reynolds argues that the court failed to consider as mitigating factors (1) that he admitted to being a habitual offender, and (2) his remorse, as demonstrated by a letter he wrote to the court.

[31] A guilty plea can be a significant mitigating factor when the State reaps substantial benefit from the defendant's act of pleading guilty. *Jackson*, 973 N.E.2d at 1131. However, Reynolds admitted to being a Habitual Offender only after a jury convicted him of Burglary. His admission thus relieved the State only of the burden of proving the nature and chronology of his past convictions. This burden involves "far fewer resources" than a jury trial. *Id.* Because Reynolds's admission to being a habitual offender did not result in a substantial benefit to the State, the trial court did not abuse its discretion in declining to consider it as a mitigating factor. *See id.*

[32] Next, Reynolds cites an undated letter to the trial court as evidence of his alleged remorse. The letter appears in the Appendix and states, in relevant part:

> I want to apology [sic] for the embarrasment [sic] and the bad example I've cause[d] in Shelby County.
>
> I want to take the responsibility for the mistake and very poor judgement [sic] I made. This mistake has awakened me from things I didn't see before which was my reckless behavior and carelessness.

(App. 130.) Even if we were to agree with Reynolds's characterization of this statement as remorseful, we cannot ignore his June 13, 2014 written statement attached to the presentence investigation report, in which he plainly states that "I do not agree with the fact I was found guilty." (Presentence Investigation Report 16.) Furthermore, in his presentence interview, he denied that he was attempting to steal property from Integrity Metals and acknowledged only the "risk," not the harm, associated with his actions that evening. (Presentence Investigation Report 14.) Because in our view evidence of remorse is not "clearly supported by the record" *Anglemyer*, 868 N.E.2d at 493, the trial court did not abuse its discretion in declining to identify it as a mitigating factor.

# Conclusion

The trial court did not err when it refused Reynolds's request to instruct the jury on criminal trespass as a lesser included offense of burglary. The trial court did not abuse its discretion in admitting two photographs or in declining to find mitigating factors during sentencing.

Affirmed.

Riley, J., and Barnes, J., concur.