## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Dec 14 2015, 8:41 am

CLERK
of the supreme court,
court of appeals and
tax court

---

ATTORNEY FOR APPELLANT

Kristin A. Mulholland
Appellate Public Defender
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

James B. Martin
Deputy Attorney General
Indianapolis, Indiana

---

# IN THE
# COURT OF APPEALS OF INDIANA

---

Charles Edward Henry,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

December 14, 2015

Court of Appeals Case No.
45A03-1504-CR-121

Appeal from the Lake Superior Court.
The Honorable Diane Ross Boswell, Judge.
Cause No. 45G03-1306-MR-6

---

**Friedlander, Senior Judge**

[1] Charles Edward Henry appeals his convictions of murder, a felony, and stalking, a Class D felony. He claims that the trial court should not have admitted into evidence an autopsy photograph of the murder victim. We affirm.

[2] Henry had been in a relationship with Brittany Peters but it ended. They had a child together, N.H. In addition, although their relationship had ended, Peters was taking care of Henry's child, C.H. Peters and the children lived in an apartment in Crown Point, Indiana. Peters was the only leaseholder on the apartment. Henry's mother, Yvonne Henry, lived near Peters' apartment in the same apartment complex.

[3] On May 12, 2013, officers were dispatched to Peters' apartment on a report of criminal trespass. When the officers arrived, Henry and Peters were present. Peters wanted Henry to return his key to her apartment and to leave. Henry handed her a key, but it was not the correct key. When Peters demanded the correct key, Henry fled to Yvonne's apartment. Officers chased him into the apartment and arrested him. After the arrest, Henry moved in with his mother. He later went to Texas and did not return to Indiana until June 2013.

[4] On June 3, 2013, Henry posted an e-card on his Facebook page. The card, which did not have any recipient's name, stated "I hate you so much that sometimes I watch CSI just to get pointers on how to kill you without actually getting caught." State's Ex. 204.

[5] After returning to Indiana on June 8, 2013, Henry contacted Peters through text messages and private messages sent through Facebook. On June 9, 2013, Peters told Henry she was pursuing a relationship with another man. Henry responded with a long string of messages, including repeated pleas to take him back. He said, "We are not promise [sic] tomorrow you are going to regret

this." State's Ex. 228. He also said, "I can't be without you please come back to me." State's Ex. 226, p. 16. Thirty minutes later, he sent a message stating, "The way you do things is going to get somebody really hurt or killed it's so easy just to pick up the phone and talk." *Id.*

[6] On June 10, 2013, Henry sent Peters the following message:

> So it want [sic] be a big deal you know like me going crazy because I will be real hurt and probably can't deal with it ain't no telling what I will do so why I'm in a down mood tell me because people get hurt over this stuff love can make you do some good thing or bad my heart is for you and always will be and always have been but once it go boom I can't help who every [sic] in my way because it want [sic] be good.

*Id.* at 18. On the same day, he sent her a text message stating, "Playing around with people [sic] feelings gets people killed." State's Ex. 227.

[7] On June 11, 2013, Henry instructed Peters to tell him if she planned to go somewhere after she left work and said that she should "take into consideration about my feelings what you wear." *Id*. On June 13, 2013, Henry sent this message to Peters: "This is going to come out real bad for somebody either me or you it's just not going to end good at all." *Id.* at 22-23.

[8] Henry spent the night of June 14, 2013, at Peters' apartment. On June 15, 2013, Henry was still there. He was supposed to pack C.H.'s clothing so that she could move away with him. Instead, Henry again asked Peters if they could reconcile. She refused and told him to go to Yvonne's apartment. Henry was initially calm but then "started up yelling." Tr. p. 44. C.H., who was eight, saw him go into the kitchen and come out holding a "butcher knife"

behind his back. *Id.* at 45. N.H., who was seven, also saw Henry holding a knife behind his back. Henry went into Peters' bedroom with her and closed the door. N.H. heard Peters scream, and C.H. heard Peters shout, "Get off of me." *Id.* at 57. N.H. banged on the door to the bedroom, but Henry told them to go to Yvonne's apartment.

[9] C.H. and N.H. ran to their grandmother's apartment. They told Yvonne, "Daddy had a knife." *Id.* at 187. After Yvonne calmed them down, she went over to Peters' apartment, leaving the children at her home. When she arrived, she rang a buzzer for five minutes before Henry responded, using the intercom. He allowed her into the apartment. Yvonne saw that he was bleeding. Henry told her that Peters was in the bedroom. She went to the bedroom and saw Peters laying on the floor, face up. Peters' eyes were open. Yvonne called 911. During the call, Henry said he was leaving. Yvonne told Henry, "You need a hospital. They're gonna find you. Where are you going?" *Id.* at 183.

[10] Police were dispatched to Peters' apartment, where Yvonne was waiting for them. When the officers entered the apartment, they saw blood spattered on a wall and dishwasher in the kitchen next to the front door, blood on the living room floor outside the kitchen, and a blood trail leading to a bedroom.

[11] A pool of blood was on the floor just inside the bedroom. Henry and Peters were in the room. Peters was laying on the floor, face up, with a large knife in her hand. The blade of the knife was facing upward, toward her face. Peters' eyes were open, but she did not appear to be breathing. Henry was seated on

the floor, leaning up against the bed. He was bleeding. There were spatters of blood in the nearby bathroom.

[12] Paramedics and fire personnel arrived and examined Peters and Henry. He was "covered in blood" and was slow to respond to questions, but he was breathing well. *Id.* at 228. Henry had a laceration on his left wrist, two puncture wounds on his chest, and three puncture wounds on his neck. None of the puncture wounds was any bigger in diameter than a pencil. The wrist laceration was bleeding more heavily than the puncture wounds, but was not "terribly deep" because it did not expose tissues or tendons. *Id.* at 232. The paramedics took Peters and Henry to the hospital. Peters was pronounced dead at the hospital. At the hospital, it was discovered that Henry also had a laceration to his neck.

[13] Meanwhile, the children left Yvonne's apartment and went outside to watch the emergency responders. A neighbor saw the children and brought them into her apartment. One of the children told the neighbor, "Daddy stabbed Mommy." *Id.* at 276.

[14] During an autopsy of Peters' body, the examiner found four stab wounds and one cut wound. The stab wounds were in the left shoulder, left chest, right chest, and the right side of the chest wall. The left shoulder stab wound entered the chest cavity, fractured a rib, and lacerated the left lung. That wound was four to five inches deep. The left chest stab wound severed the pulmonary artery, which provides blood to the lungs, and extended eight inches through

Peters' torso and out of her back. The right chest stab wound perforated the liver.

[15] DNA testing was performed on several items the police found at the apartment. Both Peters' and Henry's blood was found on the knife.

[16] The State charged Henry with murder, stalking, and harassment. The case was tried to a jury. Henry claimed self-defense. Specifically, he asserted that he grabbed the butcher knife after Peters attacked him with a smaller knife, and that she later picked up the butcher knife and he stabbed her with that knife as they struggled. The State offered, among other exhibits, multiple photographs from Peters' autopsy. Henry objected to Exhibit 81, an autopsy photograph that depicted the interior of Peters' chest cavity with all of the organs removed. Henry asserted the photograph was grotesque and would result in prejudice. The State responded that the photograph, which showed a wound to the interior of Peters' back, was necessary to display the nature and extent of her stab wounds. The trial court overruled Henry's objection.

[17] The jury determined that Henry was guilty as charged. The court declined to enter a judgment of conviction on the harassment charge and imposed a sentence for the other two crimes. This appeal followed.

[18] Henry raises one issue: whether the trial court abused its discretion by admitting Exhibit 81. The admission of a photograph is reviewed on appeal for an abuse of discretion. *Ward v. State*, 903 N.E.2d 946 (Ind. 2009). Generally, a photograph that depicts a victim's injuries or demonstrates the testimony of a

witness is admissible. *Id.* An autopsy photograph that depicts the body in an altered state may be inadmissible, but specific situations may arise in which the manipulation of a corpse is necessary to illustrate witness testimony. *Jackson v. State*, 973 N.E.2d 1123 (Ind. Ct. App. 2012), *trans. denied*. The photograph must be relevant, and its relevance must not be "substantially outweighed" by the danger of unfair prejudice to the defendant. Ind. Evid. Rule 403.

[19] The State bore the burden of proving its case and of disproving Henry's claim of self-defense beyond a reasonable doubt. Exhibit 81 was relevant to establish the nature and extent of Peters' wounds. The photograph illustrated the medical examiner's testimony, who used the photo to inform the jury as follows:

> This is the back side of the inside [sic] the chest cavity. You see the inside chest cavity is here. This large blood vessel go [sic] in. That's why this wound here that pass [sic] through, that's why to come to [sic] front here, almost pass through the back.

Tr. p. 332. Exhibit 81 was the only autopsy photograph that indicated to the jury the size of the knife that penetrated Peters' torso and went through her back.

[20] The size of the wound was relevant because Henry testified that Peters initially attacked him with a small knife, and he defended himself by picking up the bigger butcher knife and "swinging" it at Peters. *Id.* at 701. He further testified that after he put the knife down, she picked it up, and the two of them wrestled with it, during which time she sustained her fatal injuries. Exhibit 81 showed the jury how deeply the stab wound went, establishing that the butcher knife, rather than a smaller knife, caused the injury. The photograph also supported

the State's argument that Henry was not defending himself when he stabbed Peters because he had to use a degree of force greater than merely wrestling with Peters to thrust the knife through her torso. *Id.* at 757-58 ("That's not two people fighting over a knife. That is one man using all of his strength . . .").

[21] In addition, we cannot conclude that the prejudice resulting from displaying the gruesome photo substantially outweighed its probative value. The removal of the organs from Peters' chest cavity was necessary to display the depth and size of the wound to Peters' back. *See Halliburton v. State*, 1 N.E.3d 670 (Ind. 2013) (autopsy photos displaying the skin pulled back from a damaged skull were admissible because the manipulation of the corpse was necessary to demonstrate the specific injury to the jury, and the relevance outweighed any prejudice). Also, the autopsy report was admitted into evidence. The report indicated that the medical examiner, not Henry, was responsible for the manipulation of the corpse. *See Griffin v. State*, 16 N.E.3d 997 (Ind. Ct. App. 2014) (autopsy photograph was admissible because the medical examiner testified that he, not the defendant, manipulated the victim's wounds).

[22] Henry argues that our Supreme Court's decision in *Corbett v. State*, 764 N.E.2d 622 (Ind. 2002), requires us to reverse the trial court, but that case is distinguishable on its facts. In *Corbett*, the Court determined that the trial court should have excluded autopsy photographs that focused on the "hollow shell" of the body and were not material to the case. *Id.* at 628. By contrast, Exhibit 81 was necessary to display the nature and extent of the stab wound to Peters' back. *See Jackson*, 973 N.E.2d 1123 (autopsy photograph showing victim's heart

was necessary to illustrate the extent of the stab wound and was not duplicative of other photographs).

[23] For the reasons stated above, we affirm the judgment of the trial court.

[24] Judgment affirmed.

Kirsch, J., and Pyle, J., concur.