## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 16 2016, 6:54 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Scott King
Russell W. Brown, Jr.
Scott King Group
Merrillville, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General

Ian McLean
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Jeremy D. Washington,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff.*

September 16, 2016

Court of Appeals Case No.
02A05-1511-CR-2027

Appeal from the Allen Superior Court

The Honorable John F. Surbeck, Jr., Judge

Trial Court Cause No.
02D06-1404-FA-19

**Najam, Judge.**

# Statement of the Case

Jeremy D. Washington appeals his convictions for operating a vehicle while intoxicated resulting in death, as a Class C felony; operating a vehicle while intoxicated causing serious bodily injury, as a Class D felony; and criminal recklessness creating a substantial risk of bodily injury, as a Class D felony, following a jury trial. He raises four issues on appeal, which we restate as follows:

1. Whether the State presented sufficient evidence to rebut Washington's claimed defense of necessity.

2. Whether the trial court abused its discretion in admitting autopsy photographs that showed the victim's body in an altered condition.

3. Whether the trial court abused its discretion when it sentenced him.

4. Whether his sentence is inappropriate in light of the nature of the offenses and his character.

We affirm.

# Facts and Procedural History

During the evening of March 29, 2014, Brian Ybarra, Chad Jackson, and Chris Martens went to the Corner Pocket in Fort Wayne where they drank beer, ate, socialized, and watched sports on television. Washington and his friends Rebecca Ford, Clayton Delong, and Cristen Kolander were also socializing at

the Corner Pocket. Kolander left the bar a little before midnight. Soon after that, a verbal altercation started between Washington and Ybarra. Security quickly broke up the altercation and asked Washington to leave. As Washington was leaving, Ybarra or Martens made a comment about having a gun and Washington responded that he also had a gun.

[4] Washington, Ford, and Delong left the Corner Pocket and got into Washington's vehicle, a white 2011 Infiniti N37, in the parking lot. The three companions began discussing plans to go somewhere else when Ford decided that she was going to go home, exited the vehicle, and walked away. Meanwhile, inside the Corner Pocket, the bar's management asked Ybarra, Jackson, and Martens to pay their bills and leave. While Ybarra was paying his bill, he called Chase Baker and asked him to come to the Corner Pocket and bring a firearm, but Baker refused.

[5] Ybarra, Jackson, and Martens then left the Corner Pocket and walked toward Ybarra's white Tahoe SUV that was parked in the lot. As he approached his SUV, Ybarra realized that Washington and his friend were in an Infiniti that was stopped approximately thirty feet from Ybarra's SUV. Ybarra entered the driver's side of his SUV while Jackson got into the front passenger seat and Martens got into the rear passenger seat. Ybarra backed the SUV out of its parking spot, turned so that the front of the SUV faced Washington's Infiniti, and then drove next to the Infiniti toward one of the parking lot exits. Meanwhile, inside the Infiniti, Washington asked Delong if he would fight in

the event Ybarra or those with him wanted to fight. Delong declined and asked Washington to leave the parking lot.

[6] As Ybarra pulled up beside the Infiniti, he rolled down his window and, from a distance of about two feet, said to Washington, "what the f---'s your problem, motherf-----?" Tr. at 567. Washington had rolled down his driver's side window, too. Washington testified that he then saw Ybarra point a silver gun toward him and he heard shots. However, Delong only saw Washington get out a handgun from the console of his car and point it out of his driver's side window toward the SUV after Ybarra had made a racist comment to Washington. Delong then heard several gun shots. Neither Delong nor Martens nor Ybarra ever saw any gun other than Washington's. Washington then drove straight past Ybarra's SUV and exited the parking lot, turning south onto St. Joe Road.

[7] Ybarra put the SUV in motion in the opposite direction from where Washington had headed when Jackson shouted, "I'm hit!" *Id.* at 569. Ybarra saw that Jackson had been shot and was bleeding profusely from his neck. Jackson, who believed he was dying, shouted to be taken to the hospital. Ybarra turned his vehicle around, left the parking lot through the same exit Washington had taken, and turned south onto St. Joe Road to drive toward Parkview Hospital. Ybarra drove at approximately seventy miles per hour, and may have reached a speed close to ninety miles per hour. Ybarra saw Washington's Infiniti at "a distance" as he drove to the hospital. *Id.* at 574.

[8]     Meanwhile, as Washington was driving south on St. Joe Road, he looked in his rearview mirror and saw Ybarra's white SUV behind him. He told Delong, "they're coming up on us real fast." *Id.* at 1253. Thinking that Ybarra was coming after him and Delong, Washington continued to drive at a high rate of speed to get away, and he increased the distance between his car and the SUV. Washington was traveling at a speed of 102 to 107 miles per hour by the time he approached the intersection of St. Joe Road and Crescent/Stellhorn road. The speed limit on St. Joe Road is forty miles per hour, and the speed limit on Crescent/Stellhorn road is forty-five miles per hour. The traffic signal directing Washington's line of traffic was red when he approached the intersection, but he sped through it.

[9]     As Washington sped toward the intersection, Roger Gilbert, Gary Friedrich, and Halley Nellum, a seventeen-year-old sophomore at Bishop Dwenger High School, were each approaching the intersection in separate cars traveling east-bound along Crescent/Stellhorn Road. Gilbert had a red light and was stopped in the far left lane, waiting to turn north onto St. Joe Road. Friedrich, in the center lane, and Nellum, in the far right lane, had a green light to proceed through the intersection. As Washington approached the intersection, he did not apply his brakes and he drove straight through the intersection, barely missing Friedrich's car and crashing into Nellum's car at 104.86 miles per hour. The force from the impact accelerated Nellum's car to 79.78 miles per hour and sent it rolling over several times to the south where it came to rest near a gas station.

[10]     Indiana-Purdue-Fort Wayne University Police Officer Ricky Weigmann and his sergeant had been inside the gas station having coffee when they heard a "loud boom" from the intersection. Tr. at 1021. Officer Weigmann exited the gas station and saw pieces of vehicles on the roadway. He then notified dispatch of the accident and moved his squad car into the intersection to block traffic. Officer Weigmann saw Washington exit the Infiniti and use his cell phone. Officer Weigmann ran up to Washington and asked if he was all right and whether anyone else was in the Infiniti. Washington replied that no one else was in the vehicle.

[11]     Officer Weigmann also observed two off-duty medics, who had heard the crash, running to the Toyota. Officer Weigmann asked Washington to stay on the sidewalk and went over to the Toyota where he saw that the driver's door had been "pushed completely in." *Id.* at 1028. Officer Weigmann saw a "female with long hair pushed up against the ceiling, with her left leg hanging outside the . . . vehicle." *Id.* at 1028. He notified dispatch about the girl, looked at the Infiniti, and noticed that Washington was still outside the vehicle talking on his cell phone. Officer Weigmann saw someone move inside Washington's vehicle and went over to find Delong in the passenger seat. The off-duty medics attended to Delong. Officer Weigmann approached Washington and asked him to stop talking on his cell phone.

[12]     As he spoke with Washington, Officer Weigmann noted that Washington's demeanor was "calm," but that Washington's speech was slurred and that he smelled of an alcoholic beverage. *Id.* at 1036. When Officer Weigmann asked

Washington what had happened, Washington replied "there was a white Suburban shooting at me, so I was shooting back." *Id.* at 1036. When Officer Weigmann asked Washington where his gun was, Washington said it was in the Infiniti's center console. Officer Weigmann looked into the Infiniti and found Washington's Sig Sauer 1911 .45 caliber handgun, which had been placed pointing down inside the partly-closed console between the passenger's and driver's seats. Officer Weigmann took possession of the handgun, noting that there was no live round in the gun's chamber and that the gun's magazine had been removed. Officer Weigmann then spoke to medics at the scene who had determined that Nellum had died.

[13] Ybarra drove his Tahoe SUV through the intersection after the collision had occurred. He drove through a green light, and he and Martens saw debris on the road and noticed that the collision had involved Washington's Infiniti. They continued to Parkview Hospital, where Jackson was admitted for treatment. Hospital security called 9-1-1. When the police arrived at the hospital they searched Ybarra and Martens and the hospital trash cans for guns, but they found none. Ybarra consented to a search of the Tahoe, but the police also found no gun inside that vehicle. At approximately 7:45 on the morning after the crash, a Fort Wayne Police Department ("FWPD") police officer drove from Parkview Hospital, north on St. Joe Road, and to the Corner Pocket, looking to see if a firearm had been abandoned on the route, but he did not see one.

FWPD Officer Christopher Felton responded to the intersection shortly after the collision. After speaking with Officer Weigmann, Officer Felton talked with Washington, who said, "I was driving down St. Joe from Corner Pocket because they were shooting at me." Tr. at 1055. Officer Felton noticed a strong odor of alcohol on Washington's breath and he noticed that Washington was unsteady on his feet and was slurring his words. Later, at approximately 1:15 a.m. the morning after the crash, when Washington was being examined at Parkview Hospital and after his *Miranda* rights had been explained to him, Washington told Officer Felton that he and his friend

> went out to their car in the parking lot, sat for a minute, and then left the parking lot, went up to a red light, and when he was sitting at a red light, the Hispanic male [Ybarra] pulled up next to him at the red light and began firing into his car. . . . He said the Hispanic male fired into his car, he fired back at the Hispanic male, and they both began driving down St. Joe Road, having a gun battle down St. Joe Road, at which point he struck the victim['s] vehicle.

*Id.* at 1071-72. Washington told Officer Felton he "floored it . . . [t]o get away from this gun battle that he was engaged in." *Id.* at 1072.

About twenty minutes later, at 1:37 a.m., while Washington was still at the hospital, his *Miranda* rights were again explained to him by FWPD Officer James Payne. Washington then told Officer Payne that Delong had been in an altercation and pushing match with a man at the bar and had been told to leave the bar. Washington said that he and Delong were leaving in Washington's Infiniti when he saw a white SUV that "contained the guy that [Delong] had

got into it with." *Id.* at 1086. The SUV approached Washington's vehicle and a passenger in the SUV had said "What's the problem?" *Id.* at 1087. Washington told Officer Payne that Washington had replied, "like whatever[,]" and then heard a gunshot. *Id.* at 1088. Washington told Officer Payne that he "felt as though he got shot at, and then [Washington] shot and drove off. Then . . . [Washington] pulled out of the parking lot and was driving down the street, and the white SUV was following him[,] he thought[,] so he fired a couple of times back, and then an accident happened." *Id.*

[16]     At approximately 6:00 a.m. that same morning, Washington was again told his *Miranda* rights and agreed to be interviewed by FWPD Detective Nolan Banks and FWPD Officer Wilcox. Washington told them that he and Delong were in the Infiniti in the bar's parking lot when a white SUV pulled up near his vehicle: "They pointed a gun at us. They fired at us. I fired back. Took off. And when I was driving, got in an accident." State's Ex. 129 at 8. Washington explained, "I didn't—I actually—when I fired a shot, I didn't aim at 'em. I aimed at his car . . . I didn't want to hurt nobody, but I wanted to make somebody back off or whatever." *Id.* at 10-11. Washington said, "I shot away from them. I didn't shoot them. I kinda shot away." *Id.* at 20. He explained that he had directed his shots at an angle down toward the back of the SUV for this purpose, and that he was firing hollow-point bullets which were "designed to slow down." *Id.* at 21. He said, "I didn't, I didn't want to hurt anybody so I, I coulda shot the dude. I coulda hit 'em, but I was trying to, I wasn't trying to hit him. I

didn't want to hurt anybody so I shot the back of their car to make—to instill fear in them, to make them go away." *Id.* at 22.

[17] Washington told Detective Banks and Officer Wilcox that, as he drove, he removed the magazine from his firearm and tried to load another. Washington stated that he was speeding because he was scared and believed that Ybarra was chasing after him to harm him and Delong. He stated that he had attempted to use his hands-free system to call the police from his car but that he was unsuccessful. Forensic examination of a blood sample taken from Washington showed that at the time of the crash his blood alcohol was between .09 and .16.

[18] In the Corner Pocket parking lot, police found two spent cases that had been fired from Washington's .45 caliber handgun. Police also examined Ybarra's SUV and found bullet strikes and shattered windows. They recovered bullet fragments from inside the SUV. A vehicle repairman later recovered another fired bullet from the SUV's rear. That bullet had also been fired by Washington's handgun. A bullet core was removed from Jackson's neck; later forensic examination found it was typical of a fired bullet but could not positively match it or the other fragments with Washington's gun.

[19] Police also searched the Infiniti and recovered four ammunition magazines for Washington's handgun. One magazine was found on the front passenger seat loaded with eight rounds of .45 caliber ammunition. A second magazine was found on the driver's side floor board loaded with nine rounds of .45 caliber ammunition. A third magazine was also found on the driver's side floor board

and held two rounds of .45 caliber ammunition. The fourth magazine, loaded with eight rounds of .45 caliber ammunition, was found in the Infiniti's glove compartment. Police also found two unfired rounds of .45 caliber ammunition on the Infiniti's front driver seat. A spent case that had been fired in Washington's handgun was recovered from the rear passenger floor behind the driver's seat in the Infiniti. Police found no indication that gunfire had been directed at the Infiniti.

[20] Dr. Pamela Archuletta, a forensic pathologist, later performed an autopsy on Nellum's body. Dr. Archuletta found multiple cuts, abrasions, and bruises together with fractures of Nellum's left lower leg and right wrist, and gross deformation to her back. An examination of Nellum's skull required surgical procedures to determine that she had sustained sub-arachnoid and subdural hemorrhages from blunt force trauma, and atlanto-occipital dislocation, meaning that the ligament that connects the uppermost vertebra with the skull had been disarticulated from her spine, damaging her spinal cord and very quickly affecting her respiratory and circulatory systems. A surgical examination of Nellum's chest showed that she had sustained a lacerated aorta during the collision as well as internal injuries to her liver, spleen, ribs, and lungs. Dr. Archuletta's conclusion was that Nellum had died from multiple blunt force injuries due to the collision.

[21] The State charged Washington with: attempted murders of Jackson (Count I), Ybarra (Count II), and Martens (Count III); aggravated battery of Jackson (Count IV); reckless homicide regarding Nellum's death (Count V); operating a

vehicle while intoxicated resulting in Nellum's death (Count VI); operating a vehicle while intoxicated causing serious bodily injury to Delong (Count VII); murder of Nellum (Count VIII); criminal recklessness creating a substantial risk of bodily injury to Friedrich (Count IX) and Joanne Whitham, the passenger in Gilbert's vehicle (Count X); and criminal recklessness creating a substantial risk of bodily injury to Gilbert (Count XI).

[22] During his jury trial, Washington objected to the admission of any photographs taken during Dr. Archuletta's autopsy, stating that he would stipulate to the cause of Nellum's death and therefore the photographs were unnecessary and would be more prejudicial than probative. Dr. Archuletta had testified that the photographs at issue were necessary to adequately explain her testimony to the jury, and the trial court overruled Washington's objection.

[23] The jury found Washington not guilty of Counts I through IV, Count VIII, Count X, and Count XI. The jury found him guilty of Count V, reckless homicide regarding Nellum's death; Count VI, operating a vehicle while intoxicated resulting in Nellum's death; Count VII, operating a motor vehicle while intoxicated causing serious bodily injury to Delong; and Count IX, criminal recklessness creating a substantial risk of bodily injury to Friedrich. The trial court did not enter judgment of conviction on Count V but merged it with Count VI. The court entered judgment of conviction on Count VI and a sentence of six years executed within the Department of Correction ("DOC"), with two years suspended to probation. On Counts VII and IX, the trial court imposed one and one-half years for each count, to be served consecutively.

Thus, the court imposed an aggregate sentence of nine-and-one-half years in the DOC, with two years suspended to probation. This appeal ensued.

# Discussion and Decision

## *Issue One: Sufficiency of the Evidence*

[24] Washington challenges the sufficiency of the evidence to support any of his three convictions. However, he does not contest that he sped through a red traffic light and collided with Nellum's vehicle, causing her death, nor does he contest that his actions caused injury or risk of injury to Delong and Friedrich. Rather, he maintains that he took those actions out of manifest necessity and that the State failed to provide sufficient evidence to rebut his defense of necessity.

[25] In order to prevail on a defense of necessity, a defendant must show:

> (1) the act charged as criminal must have been done to prevent a significant evil; (2) there must have been no adequate alternative to the commission of the act; (3) the harm caused by the act must not be disproportionate to the harm avoided; (4) the accused must entertain a good-faith belief that his act was necessary to prevent greater harm; (5) such belief must be objectively reasonable under all the circumstances; and (6) the accused must not have substantially contributed to the creation of the emergency.

*Patton v. State*, 760 N.E.2d 672, 675 (Ind. Ct. App. 2002) (citing *Toops v. State*, 643 N.E.2d 387, 390 (Ind. Ct. App. 1994)). In order to negate a claim of necessity,

the State must disprove at least one element of the defense beyond a reasonable doubt. The State may refute a claim of the defense of necessity by direct rebuttal, or by relying upon the sufficiency of the evidence in its case-in-chief. The decision whether a claim of necessity has been disproved is entrusted to the fact-finder. Where a defendant is convicted despite his claim of necessity, this court will reverse the conviction only if no reasonable person could say that the defense was negated by the State beyond a reasonable doubt.

*Dozier v. State*, 709 N.E.2d 27, 29 (Ind. Ct. App. 1999) (citations omitted).

[26] When reviewing whether the State presented sufficient evidence to negate a defendant's claim of necessity, we apply the same standard of review used for all sufficiency of the evidence questions. *Id*. at 30. We neither reweigh the evidence nor assess the credibility of the witnesses. *See, e.g.*, *Jackson v. State*, 925 N.E.2d 369, 375 (Ind. 2010). We consider only the probative evidence and reasonable inferences therefrom that support the conviction, *Gorman v. State*, 968 N.E.2d 845, 847 (Ind. Ct. App. 2012), *trans. denied*, and we "consider conflicting evidence most favorably to the trial court's ruling," *Wright v. State*, 828 N.E.2d 346, 352 (Ind. 2005). We will affirm if the probative evidence and reasonable inferences drawn from that evidence "could have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt." *Jackson*, 925 N.E.2d at 375.

[27] Even assuming for the sake of argument that Washington had shown the existence of all six factors required for the defense of necessity, the State

presented sufficient evidence to negate not just one, but each of those factors.[1] The State presented sufficient evidence that no one had shot at Washington but, rather, Washington had shot at Ybarra's vehicle before fleeing. Delong, the passenger in Washington's vehicle, testified that he never saw Ybarra or anyone other than Washington shooting a gun, either in the parking lot or anywhere else. Martens, a passenger in Ybarra's vehicle, also testified that he saw only Washington shooting a gun in the parking lot, and that no one in Ybarra's vehicle had a gun. Moreover, the police found evidence in the parking lot and Washington's vehicle which showed that Washington's gun had been fired in the parking lot at Ybarra's vehicle. Yet, the police found no evidence that Ybarra or anyone in his vehicle ever had a gun, and they found no evidence that anyone had shot a gun at Washington's vehicle. Moreover, Washington himself gave inconsistent accounts of the events of that evening, at one point claiming the gun-fire started when Ybarra shot at him at a red light on St. Joe Road, and at other points stating the gun-fire started when Ybarra shot at him in the parking lot.

[28] This was sufficient evidence from which the jury could reasonably infer that no one ever shot at Washington and therefore: (1) he was not acting to prevent the "significant evil" of being shot by Ybarra or his companions; (2) he had

---

[1] Washington contends that his guilty verdicts should be reversed because they are inconsistent with the not guilty verdicts. However, jury verdicts in criminal cases are not subject to appellate review on the grounds they are inconsistent, contradictory, or irreconcilable. *Beattie v. State*, 924 N.E.2d 643, 649 (Ind. 2010). Nor does an acquittal on one count indicate a jury's conclusions about other counts. *Id*. at 648-49.

adequate alternatives to speeding through a red light; (3) the harm he caused was disproportionate to the harm avoided; (4) he did not believe in good faith that his actions were necessary to prevent a greater harm; (5) any such belief would not have been objectively reasonable under all circumstances; and (6) he substantially contributed to the creation of the emergency, to the extent one existed. *Patton*, 760 N.E.2d at 675. The State presented sufficient evidence to sustain Washington's convictions and negate his claimed defense of necessity.

### Issue Two:  Admission of Autopsy Photographs

[29]  Washington contends that the trial court erred in admitting autopsy photographs of Nellum. Specifically, he alleges that State's Exhibits 96 and 97 should not have been admitted because their probative value was substantially outweighed by the danger of unfair prejudice.

> Because the admission and exclusion of evidence falls within the sound discretion of the trial court, this Court reviews the admission of photographic evidence only for abuse of discretion. *Byers v. State*, 709 N.E.2d 1024, 1028 (Ind. 1999); *Amburgey v. State*, 696 N.E.2d 44, 45 (Ind. 1998). Relevant evidence, including photographs, may be excluded only if its probative value is substantially outweighed by the danger of unfair prejudice. Ind. Evidence Rule 403; *Byers*, 709 N.E.2d at 1028. "Even gory and revolting photographs may be admissible as long as they are relevant to some material issue or show scenes that a witness could describe orally." *Amburgey*, 696 N.E.2d at 45; *see also Byers*, 709 N.E.2d at 1028. Photographs, even those gruesome in nature, are admissible if they act as interpretative aids for the jury and have strong probative value. *Spencer v. State*, 703 N.E.2d 1053, 1057 (Ind. 1999); *Robinson v. State*, 693 N.E.2d 548, 553 (Ind. 1998).

*Swingley v. State*, 739 N.E.2d 132, 133 (Ind. 2000). Autopsy photos are generally inadmissible if they show the body in an altered condition unless the alteration of the body is necessary to demonstrate the testimony being given. *Corbett v. State*, 764 N.E.2d 622, 627 (Ind. 2002).

[30] Here, State's Exhibits 96 and 97 showed Nellum's body in a surgically altered state, but, according to Dr. Archuletta, the photographs were necessary to demonstrate her testimony about the nature of the injuries and the cause of death. Dr. Archuletta's testimony about those photographs established, in addition to other facts, that Nellum's injuries were not survivable and that the collision, and no other intervening cause, caused her death. Thus, although the autopsy photographs were surgically altered, that alteration was necessary to determine and testify about the extent, nature and cause of Nellum's injuries. *See Corbet*, 764 N.E.2d at 627. Therefore, the probative value of the photographs was not substantially outweighed by unfair prejudice, and the trial court did not abuse its discretion in admitting them.[2]

[31] Still, Washington maintains that the probative value of the photographs was minimal because he was willing to "stipulate to the cause of death." Appellant's Br. at 16. However, even assuming Washington means he would

---

[2] We note that, even if it had been error to admit the photographs in State's Exhibits 96 and 97, such error would have been harmless as the remaining evidence was sufficient to support the convictions. *See, e.g.*, *Jackson v. State*, 973 N.E.2d 1123, 1129-30 (Ind. Ct. App. 2012) ("If a conviction is supported by substantial independent evidence of guilt which satisfies the reviewing court that there is no substantial likelihood the challenged evidence contributed to the conviction, the error is harmless."), *trans. denied*.

have stipulated that he caused Nellum's death by crashing into her car after running a red light at a high rate of speed,[3] such a stipulation still would not affect the trial court's consideration of the admissibility of the photographs.

> [T]here is no rule limiting the facts in issue when one party unilaterally concedes or offers to stipulate that a fact be taken as proved. [*Butler v. State*, 647 ne2d 631,] 633 [(Ind. 1995)]. Instead, . . . [i]n a homicide case, the identity of the alleged victim and the assailant, the injury to the alleged victim and its source, the death of the alleged victim and its cause, and the physical surroundings in which the injury and death occurred, would all be facts of consequence in the determination of guilt of the accused. *Id*.

*Halliburton v. State*, 1 N.E.2d 670, 677 (Ind. 2013) (quotations omitted); *see also Perigo v. State*, 541 N.E.2d 936, 940 (Ind. 1989) ("An offer to stipulate does not affect the trial court's consideration of the admissibility of evidence."). Accordingly, Washington cannot demonstrate reversible error on this issue.

### Issue Three:  Abuse of Discretion in Sentencing

[32] Washington asserts that the trial court's sentencing statement was insufficient because it failed to provide the reasons for the sentence.  When a sentence is within the statutory range, as it was here,[4] we review it for an abuse of discretion.  "An abuse of discretion occurs if the decision is 'clearly against the

---

[3] Washington does not say to exactly what cause he would stipulate as the cause of death.

[4] The advisory sentence for a Class C felony is four years, and the maximum sentence is eight years.  Ind. Code § 35-50-2-6(a) (2014).

logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom.'" *K.S. v. State*, 849 N.E.2d 538, 544 (Ind. 2006) (quoting *In re L.J.M.*, 473 N.E.2d 637, 640 (Ind. Ct. App. 1985)).

[33] Trial courts imposing felony sentences must make statements which may be oral, written, or both, *Gleason v. State*, 965 N.E.2d 702, 711 (Ind. Ct. App. 2012), and which include a reasonably detailed recitation of the trial court's reasons for imposing a particular sentence, *Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind. 2007). "This necessarily requires a statement of facts, in some detail, which are peculiar to the particular defendant and the crime, as opposed to general impressions or conclusions." *Anglemyer*, 868 N.E.2d at 490. And, while the trial court is not required to consider aggravating and mitigating factors, if its recitation of its reasons for the sentence includes such factors, the trial court "must identify all significant mitigating and aggravating circumstances and explain why each circumstance has been determined to be mitigating or aggravating." *Id.*

[34] Here, in its oral sentencing statement,[5] the trial court specifically noted that it had considered "each and every" aggravating and mitigating circumstance set out by each party, but that it did not "necessarily place the same weight [on]

---

[5] In the written judgment of conviction, the trial court left blank the section identifying the mitigating and aggravating circumstances. App. Vol. IV at 2. However, a trial court's consideration of the mitigating and aggravating factors "may be evidenced in either the written order or in an oral sentencing statement." *Anderson v. State*, 989 N.E.2d 823, 826 (Ind. Ct. App. 2013) (citing *Gleason*, 965 N.E.2d at 711), *trans. denied.*

each of them." Sent. Tr. at 68. The trial court then noted some specific factors[6] that influenced its sentencing, namely, the "significant impact on the entire community" from Nellum's death, the suffering and substantial hardship and loss to the families involved, and the seriousness of the offenses. *Id.* at 67. The court stated that these were the reasons it was adding two years, suspended, and two years of probation to the advisory sentence of four years. The trial court's oral sentencing statement provided sufficient detail of its reasons for its sentence.

### Issue Four: Inappropriateness of Sentence

[35] Finally, Washington contends that his sentence is inappropriate in light of the nature of the offenses and his character. Article 7, Sections 4 and 6 of the Indiana Constitution "authorize[] independent appellate review and revision of a sentence imposed by the trial court." *Roush v. State*, 875 N.E.2d 801, 812 (Ind. Ct. App. 2007) (alteration original). This appellate authority is implemented through Indiana Appellate Rule 7(B). *Id.* Revision of a sentence under Rule 7(B) requires the appellant to demonstrate that his sentence is inappropriate in light of the nature of his offenses and his character. *See* Ind. Appellate Rule 7(B); *Rutherford v. State*, 866 N.E.2d 867, 873 (Ind. Ct. App. 2007). We assess the trial court's recognition or non-recognition of aggravators and mitigators as an initial guide to determining whether the sentence imposed

---

[6] A trial court is not required to use the exact words "aggravator" or "mitigator" in its sentencing statement. *Lewis v. State*, 31 N.E.3d 539, 543 n.7 (Ind. Ct. App. 2015).

was inappropriate. *Gibson v. State*, 856 N.E.2d 142, 147 (Ind. Ct. App. 2006). However, "a defendant must persuade the appellate court that his or her sentence has met th[e] inappropriateness standard of review." *Roush*, 875 N.E.2d at 812 (alteration original).

[36] Indiana's flexible sentencing scheme allows trial courts to tailor an appropriate sentence to the circumstances presented, and the trial court's judgment "should receive considerable deference." *Cardwell v. State*, 895 N.E.2d 1219, 1222, 1224 (Ind. 2008). The principal role of appellate review is to attempt to "leaven the outliers." *Id.* at 1225. Whether we regard a sentence as inappropriate at the end of the day turns on "our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other facts that come to light in a given case." *Id.* at 1224. The question is not whether another sentence is more appropriate, but rather whether the sentence imposed is inappropriate. *King v. State*, 894 N.E.2d 265, 268 (Ind. Ct. App. 2008). Deference to the trial court "prevail[s] unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character)." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015).

[37] Washington does not assert that his offenses were not serious or that the consequences were not severe. Rather, he contends that the serious and severe nature of the offenses "was significantly diminished by the grave peril he faced." Appellant's Br. at 18. However, as we have already noted, the

evidence sufficiently established that no one shot at Washington; therefore, to the extent he actually believed that he was in danger, that belief was unreasonable and certainly did not "diminish" the seriousness of his illegal actions that resulted in the death of a young woman and injury and risk of injury to others. Moreover, any exigency that did exist was Washington's own creation. And Washington showed no restraint or regard for human life when he sped through a red light at 104 miles per hour while intoxicated. His sentence was not inappropriate in light of the nature of the offenses.

[38] Washington also maintains that the sentence is inappropriate in light of his good character. Specifically, he points to evidence that he was a good husband and father, that he was gainfully employed, that he had no criminal history, that he showed remorse for his actions, and that the trial court acknowledged that he "was not a bad guy." Sent. Tr. at 67. However, as noted above, the trial court considered "each and every" aggravating and mitigating circumstance set out by each party, although it did not "necessarily place the same weight [on] each of them." *Id*. at 68. The circumstances the trial court considered included the "seriousness of the crimes," *Id*. at 47; the "extraordinary impact," (i.e., hitting Nellum's car at 104 miles per hour), which caused "extraordinary injuries" and death, *Id*. at 48; the "significant substantial loss and hardship" suffered by the families involved, *Id*. at 67; and the "significant impact on the entire community" from a local high school girl's tragic death, *Id*. Although the trial court did note that Washington is not a "bad guy," it stated that issuing a "purely suspended sentence would depreciate

the seriousness of this offense." *Id*. Clearly, the trial court believed that the aggravating factors outweighed the mitigating factors such that an enhancement of two years, suspended, and two years of probation was warranted. We cannot say that Washington's sentence is inappropriate in light of the nature of the offenses and his character.

## Conclusion

[39] The State presented sufficient evidence to support Washington's convictions and negate his claimed defense of necessity. And the trial court did not abuse its discretion in admitting State's Exhibits 96 and 97, which were autopsy photographs with probative value that was not outweighed by unfair prejudice. Finally, the sentencing statement is sufficient and Washington's sentence is not inappropriate. Thus, we affirm Washington's convictions and sentence.

[40] Affirmed.

Vaidik, C.J., and Baker, J., concur.