

**FILED**

Oct 26 2023, 8:55 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

Attorneys for Appellant
Valerie K. Boots
Talisha Griffin
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General

George P. Sherman
Supervising Deputy Attorney
General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Larry Lee Jackson, Jr., <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff* | October 26, 2023 <br><br> Court of Appeals Case No. <br> 22A-CR-2955 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Mark D. Stoner, Judge <br><br> Trial Court Cause No. <br> 49D32-2112-F1-37122 |

**Opinion by Chief Judge Altice**
Judges May and Foley concur.

**Altice, Chief Judge.**

## Case Summary

Larry L. Jackson, Jr. was charged with attempted murder and, following a jury trial, was convicted of Level 3 felony aggravated battery. He appeals raising the following three restated issues:

> I. Did the trial court err when it gave, sua sponte and over Jackson's objection, a jury instruction on aggravated battery as a lesser included offense of attempted murder?

> II. Did the trial court abuse its discretion when it denied Jackson's tendered self-defense instruction?

> III. Did the trial court abuse its discretion when it admitted certain evidence over Jackson's objection?

We affirm.

## Facts & Procedural History

In December 2021, Jackson, sixty years old, was living in apartment 501 in Lugar Towers in Indianapolis. The Lugar Towers complex is known to be a "high crime" area, with Indianapolis Metropolitan Police Department (IMPD) receiving calls almost nightly. *Transcript Vol. 2* at 183, 198. Jackson's apartment, on the fifth floor, was the first apartment to the left of the elevator. There are fifteen stories in the towers, with cameras on every floor except floors thirteen, fourteen, and fifteen. There are no cameras in the elevators.

According to Jackson, a non-tenant named Adrian King Taylor, known to Jackson as "King," was often seen loitering inside the building, harassing

people for money or drugs, and sometimes robbing or beating up tenants. *Transcript Vol.* 3 at 75. Jackson reported that Taylor had robbed and threatened him on a couple of occasions in November 2021, and Jackson gave him money, which worked to "defuse the situation." *Id.*

[5] In the early morning hours of December 4, 2021, there was an encounter between Jackson and Taylor, recorded on a surveillance camera on the fifth floor, in which Jackson stabbed Taylor in the chest. Jackson ran down the stairs and out of the building, discarding the knife and walking toward a nearby gas station.

[6] Meanwhile, Taylor walked toward the stairwell but came back and got on the elevator and made his way out of the building. He was in the backseat of a vehicle, with its door open, when emergency responders arrived. IMPD Officer Amanda Tatomirovich was the first to make contact with Taylor, who was grabbing his chest and was in distress, unable to clearly speak his name. Officer Tatomirovich performed a pat down on Taylor before he was taken away by ambulance, and no weapons were found, only some loose change in his hands and pockets. Forty-two-year-old Taylor received emergency surgery and survived.

[7] IMPD Officer Jamie Hadley also responded to the dispatch about the stabbing, and she saw Jackson, who matched the description of the suspect, on foot a short distance from Lugar Towers. Officer Hadley stopped Jackson, whom she described as very calm and cooperative and not startled about being stopped by

police.  Jackson was transported to a police station.  Officers looked for a knife in the area where Jackson had been but did not find one.

[8]     IMPD Detective Corey Shaffer conducted a recorded interview of Jackson. Jackson told Detective Shaffer that there had been a sudden banging on his apartment door, which came open, and Taylor entered, threatening Jackson that he was going to shoot him if Jackson did not "give [him] something." *Exhibit Vol.* at 29 (State's Exhibit 24, transcript of interview).  Jackson described that Taylor told him that he better "go get [him] some Katy"[1] or else Taylor would "shoot [Jackson's] motherf*cking ass." *Id*.  Jackson told Detective Shaffer that, to get Taylor out of his apartment, he agreed, and Taylor handed him a dollar bill and some change, totaling about five dollars.  Jackson then went "straight downstairs" to the lobby, where he went outside and had a cigarette. *Id*. at 34.

[9]     Jackson stated that when he came back inside to go to his apartment, Taylor was already in the elevator and that he tried to give the money back to Taylor but he refused it.  Jackson described that Taylor had his "hands balled up," and was "getting ready to try to hurt" Jackson, so Jackson, while on the elevator, pulled out the knife from his pocket and "poked" Taylor as Taylor was coming toward him. *Id*. at 36, 40.  Jackson reported that, when the elevator opened on the third or fourth floor, he ran down a stairwell and out of the building, with

---

[1] The record indicates Katy or Katie "is slang for a drug." *Transcript Vol. 3* at 39.  It originally referred to commercially produced synthetic marijuana but now "could be a number of different" drugs. *Id*. at 40.

Taylor chasing him. Jackson told Detective Shaffer that he did not go to the fifth floor. Jackson said that he dropped the knife in an alley. Detective Shaffer looked for the knife, but it was never found.

[10] On December 8, 2021, the State charged Jackson with attempted murder, alleging that Jackson attempted to kill Taylor by "stabbing Adrian Taylor in the chest with the specific intent to kill Adrian Taylor." *Appellant's Appendix* at 23.

[11] Prior to trial, Jackson sought to exclude the second portion of Officer Tatomirovich's body cam footage (Exhibit 15), which showed Taylor bloodied in the back of the vehicle and then falling to the ground as he stood up, requiring assistance onto the stretcher. Jackson argued that it had no evidentiary value and was highly prejudicial. The State maintained that the footage showing Taylor's deteriorating condition was "very relevant" because Taylor's injuries initially did not appear too serious on the surveillance video. *Transcript Vol. 2* at 132. The State explained that the footage was important to illustrate to the jury "how someone who is walking and talking on the surveillance video after the incident, all of a sudden is minutes from death by the time he gets to the hospital." *Id.* After viewing the portion of the video at issue, the court found that its relevancy outweighed any prejudice.

[12] Also prior to trial, Jackson argued for the admission of statements he made about Taylor while alone in the interview room. The State intended to offer into evidence only that portion of the video that contained the interview (Exhibit 23) – stopping the video when the detective left the room. Jackson

wanted the full video admitted under the doctrine of completeness, noting that Jackson was unaware he was being recorded and that the part not included in Exhibit 23 showed Jackson's "subjective belief [about Taylor] at the time." *Id.* at 137. The court found that Jackson's statements were volunteered, not within a hearsay exception, and not admissible under the rule of completeness, but noted that the statements "do reflect [Jackson's] state of mind" and that defense could present them in its case-in-chief, if desired. *Id.* at 139.

[13] A jury trial was held on October 25, 2022. At trial, Lugar Towers surveillance camera footage, without sound, was admitted as State's Exhibit 19. It showed the two men getting on and off the elevators in the lobby and on the fifth floor, sometimes together and sometimes not, a number of times between 3:42 and 3:57 a.m. At 3:56 a.m., they both exit the elevator on the fifth floor and are seen standing next to it. Jackson is seen picking up small, indiscernible items off the floor, and trying to hand them to Taylor, who jerks his hand away and appears to refuse the items. Taylor, saying something to Jackson, begins to turn away, then turns back to Jackson, who suddenly reaches into his hoodie pocket, pulls out a knife, stabs Taylor in the chest, and runs away. Taylor leaves the camera view for some seconds then returns, pulls up his shirt to show dripping blood, talks and shows the injury to someone else, and then gets on the elevator. Taylor is seen getting off the lobby elevator and walking out of the building at 3:59 a.m.

[14] Detective Shafer testified that, contrary to Jackson's statement that the incident occurred in the elevator, the stabbing occurred on the fifth floor in the hallway

near the elevator. Further, Taylor did not chase Jackson out of the building as Jackson had reported. The recorded interview with Detective Shaffer, which video ended when the detective left the room, was offered and admitted into evidence as Exhibit 23, over Jackson's objection.[2]

[15] During Officer Tatomirovich's testimony, the State sought to admit her bodycam footage as Exhibit 15. Jackson objected to the admission of the second portion that showed Taylor's deteriorating condition before emergency personnel arrived. The court admitted the first portion of Exhibit 15 without objection and the second portion over Jackson's objection.

[16] Bryan Carr, M.D., the trauma surgeon who treated Taylor, testified that Taylor was minutes from dying when he arrived at the hospital. Surgery revealed that Taylor had a hole, about half an inch in size, in the left side of his heart and "a massive amount of hemorrhage" in a tissue sack surrounding the heart. *Transcript Vol. 2* at 205. Taylor was on a ventilator for a period and required a second surgery. He was in the hospital for approximately fourteen days.

[17] Jackson testified about the series of events, describing that he was chopping onions in his kitchen when Taylor banged on his apartment door and entered, despite Jackson trying to brace the door shut. He explained that he feared Taylor because he had witnessed Taylor beat up other people in the building at least twice and that Taylor had robbed Jackson on a couple of prior occasions.

---

[2] Exhibit 24 was a transcription of Exhibit 23 and was admitted for demonstrative purposes.

Jackson stated that he and Taylor sat at his table, and Taylor gave him some dollars and change, instructing Jackson to go find him some "Katie or some crack or something." *Transcript Vol. 3* at 68.

[18] Jackson stated that he left his apartment, with a knife in his pocket, and first took the elevator up to the thirteenth floor, looking for someone he believed might have drugs that he could buy for Taylor, and, unsuccessful with that, he took the elevator down to the first floor and exited the building briefly. He said that, having no success finding drugs, he got back on the elevator to return to his apartment and encountered Taylor. They exited together on the fifth floor, and Jackson testified that he tried to hand Taylor his money back, but Taylor refused it.

[19] Jackson testified, "[Taylor] balled his fist up" and "hit my arm" and said "give me some motherf*cking money, or I'm going to shoot your motherf*cking ass." *Id*. at 72, 76. Jackson testified that he "just panicked," as he was afraid of Taylor, and "poked" him with the knife. *Id.* at 76, 93. Jackson acknowledged that did not see a weapon on Taylor but "truly believed he had a weapon," adding that Taylor "has threatened me so many times." *Id*. at 73. Jackson testified that he did not intend to kill Taylor. *Id*. at 76.

[20] After the parties rested, the jury was excused and final jury instructions were discussed. The trial court asked if anyone objected "to the Court's proposed finals." *Id*. at 126. Jackson objected to Instructions 8 and 9, which defined the charged offense of attempted murder and stated that aggravated battery, also

defined in the instructions, was a lesser included offense of which the jury could find Jackson guilty if the necessary elements were proven. Jackson's counsel stated repeatedly that the defense did not want "any mention of aggravated battery" as Jackson did not want "any lesser" offenses mentioned at all. *Id.* at 127. The exchange with defense counsel continued, with the court asking for the reason that Jackson's counsel did not believe a lesser included instruction should be given:

> Defense Counsel: Yes. I believe that even though a lesser Ag Bat can be -- I think there is a little bit of mixed caselaw on whether it is inherently included or not, but that aside, the elements of aggravated battery are almost identical to the attempt murder that we're dealing with. By giving that instruction, I feel that this is going to reduce the burden of the State. They have a high burden, which is, to me, the specific intent for attempt murder, and since there are not really that much difference, if any, between the two, between the Ag Bat and the attempted murder, then I think, by offering an aggravated battery, that will be like a compromise, offering the jury a compromise verdict, which is -- makes it easier for the State.
>
> Court: Okay. And do you believe as a matter of strategy, that you wish not -- the aggravated battery not be given?
>
> Defense Counsel: Correct.

*Id.* at 128. The trial court asked for the State's position, with the State responding:

> I think it's appropriate given the facts, Judge. I think this is a factually inherent -- or factually included lesser. As [defense

counsel] said, the elements are very similar. The facts are all the same. And if the Court finds that there's been a serious evidentiary dispute about an element, which in this case, our understanding is it's going to be the mens rea, the specific intent to kill, then the lesser included would be -- would be appropriate as a factually included lesser. So we do think it's appropriate to give.

*Id.* The court stated that the evidence reflected an evidentiary dispute as to Jackson's intent, which supported giving the lesser included aggravated battery instruction.

[21] The court asked Jackson's counsel if he had discussed with Jackson "the risk he takes by an all-or-nothing strategy," and counsel stated he had, but would do so again. *Id.* Following a recess, counsel for Jackson stated that he and Jackson had discussed the two charges and the penalties for each and that "[Jackson] told me that he wants to go all or nothing." *Id.* at 131. The court, speaking directly to Jackson, asked if that is how he wished to proceed, and he responded in the affirmative.

[22] After reviewing caselaw off the record, the court determined that "there is not an absolute right to refuse a valid lesser included offense instruction" where, as here, "there is a serious evidentiary dispute" on the element distinguishing the two offenses, in this case, the mens rea. *Id.* at 135.

> The aggravated battery, as the caselaw's indicated, is an inherently included offense because the elements are virtually identical with the exception of the specific intent to kill. Court notes that aggravated battery doesn't require a touching [and] . . .

> simply requires an inflicting of injury. And the language of the statute -- or charging information in this particular case is that the Defendant intentionally -- attempted to intentionally kill another human being by the stabbing.
>
> So the Court does believe, one, it's inherently included; secondly, that it is factually included; third, that based on the evidence the Court's previously cited, that there is a serious evidentiary dispute.

*Id*. at 136. The court gave the lesser included aggravated battery instruction over Jackson's objection.

[23] Jackson also took issue with the court's decision regarding what self-defense instruction would be given. Specifically, the court determined that it would give the court's self-defense instruction, Final Instruction 3, which was consistent with pattern jury instruction 10.03. The court declined to give Jackson's tendered instructions 1 and 6, finding that instruction 1 was already covered by the court's Final Instruction 3 and that instruction 6 (Defense Instruction 6) contained language that the Indiana Supreme Court had determined was unnecessary and misleading.

[24] The jury found Jackson guilty of Level 3 felony aggravated battery. The court sentenced him to eight years with six executed and two suspended with no probation. Jackson now appeals. Additional facts will be supplied as needed.

# Discussion & Decision

## I. Aggravated Battery Instruction

[25] It is well settled that when a party asks a trial court to instruct the jury on an alleged lesser included offense of the crime charged, the court must conduct a three-part analysis to determine whether the instruction is appropriate. *Watts v. State*, 885 N.E.2d 1228, 1231 (Ind. 2008).

> First, the trial court must compare the statute defining the crime charged with the statute defining the alleged lesser included offense to determine if the alleged lesser included offense is inherently included in the crime charged. Second, if a trial court determines that an alleged lesser included offense is not inherently included in the crime charged under step one, then it must determine if the alleged lesser included offense is factually included in the crime charged. If the alleged lesser included offense is neither inherently nor factually included in the crime charged, the trial court should not give an instruction on the alleged lesser included offense. Third, if a trial court has determined that an alleged lesser included offense is either inherently or factually included in the crime charged, "it must look at the evidence presented in the case by both parties" to determine if there is a serious evidentiary dispute about the element or elements distinguishing the greater from the lesser offense and if, in view of this dispute, a jury could conclude that the lesser offense was committed but not the greater. "[I]t is reversible error for a trial court not to give an instruction, when requested, on the inherently or factually included lesser offense" if there is such an evidentiary dispute.

*Webb v. State*, 963 N.E.2d 1103, 1106 (Ind. 2012) (quoting *Wright v. State*, 658 N.E.2d 563, 566-67 (Ind. 1995)).

[26] Here, Jackson does not dispute that aggravated battery was a lesser included offense of attempted murder or that a serious evidentiary dispute existed as to the mens rea element, that is, whether Jackson possessed specific intent or whether he acted knowingly and intentionally. Rather, Jackson's argument is that the *Wright* three-part analysis applies *only* when a party has requested an instruction – and *not* when, as here, a trial court gives a jury instruction sua sponte.

[27] This court faced a similar instructional challenge in *Washington v. State*, 685 N.E.2d 724 (Ind. Ct. App. 1997), where the defendant was charged with murder and, over the defendant's objection, the trial court sua sponte instructed the jury on voluntary manslaughter, of which he was convicted. In addressing whether it was proper to give the sua sponte instruction, this court applied the *Wright* test, first finding that, under step one of the test, voluntary manslaughter is an inherently included offense of murder[3] and, under the third step, there was "sufficient evidence of sudden heat" to warrant the giving of the instruction.[4]

---

[3] The *Washington* court cited *Griffin v. State*, 644 N.E.2d 561, 562 (Ind. 1994), for the proposition that "voluntary manslaughter is simply murder mitigated by sudden heat." Our Supreme Court later clarified in *Watts v. State* that, "even though under Indiana law voluntary manslaughter is a lesser-included offense of murder, a conviction for murder does not mean that a defendant could also have been convicted of voluntary manslaughter" and "[s]udden heat must be separately proved." 885 N.E.2d 1228, 1233 (Ind. 2008). "Therefore, if there is no serious evidentiary dispute over sudden heat, it is error for a trial court to instruct a jury on voluntary manslaughter in addition to murder," and to the extent that *Griffin* and a number of other cases were inconsistent with that, they were overruled. *Id*. The *Watts* Court's overruling of *Griffin* does not affect the validity of *Washington*'s relevancy to our case.

[4] Judge Staton dissented. He found that, contrary to the majority's conclusion, there was "an absolute absence" of a serious evidentiary dispute regarding Washington's sudden heat and that the instruction on voluntary manslaughter over the defendant's timely objection was reversible error. 685 N.E.2d at 729.

*Id.* at 728.  The *Washington* court thus applied the *Wright* analysis even though no party had requested the instruction.[5]  Jackson urges that *Washington* was "wrongly decided" and asks us not to repeat that court's mistake.  *Reply Brief* at 5.

[28]   However, *Washington* was not alone in applying the *Wright* analysis when a trial court sua sponte gave a lesser included instruction.  In *Ross v. State*, 877 N.E.2d 829 (Ind. Ct. App. 2008), *trans. denied*, this court, while addressing the denial of petition for post-conviction relief, evaluated whether the defendant received ineffective assistance of trial counsel for counsel's failure to object to the trial court's sua sponte instruction on Class A felony voluntary manslaughter as a lesser included offense of murder.  In *Ross*, the defendant's argument was that the only proper voluntary manslaughter instruction that could have been given was for Class B felony manslaughter (because the offense is a Class A felony if it is committed by means of a deadly weapon and the charging information against Ross did not specify that he committed murder by means of a deadly weapon).

[29]   Although the instruction was given sua sponte, the *Ross* court stated that, per *Wright*, "[f]or jury instruction purposes, if one offense is inherently included within another, it is proper for a trial court to give an instruction on the lesser

---

[5] This includes the dissent.  That is, although Judge Staton disagreed with the majority about the existence of a serious evidentiary dispute as to sudden heat and opined that "[t]he court-induced voluntary manslaughter instruction undermined the defendant's defense of self-defense," he explained that "the reversible error here was created by the trial court failing to follow the third prong of the analysis set forth in *Wright*."  *Id*.

included offense if there is a serious evidentiary dispute regarding the element that distinguishes the greater offense from the lesser offense." *Id.* at 835. Thus, as in *Washington*, the *Ross* court applied *Wright* in evaluating the appropriateness of the court's sua sponte instruction. The crux of the discussion – about the appropriateness of the sua sponte lesser included instruction – concerned the existence, or not, of any serious evidentiary dispute as to sudden heat. Ultimately, the *Ross* court determined that, based on the ineffective assistance of counsel standard of review, the defendant failed to establish that his counsel was ineffective for failing to lodge an objection to the Class A felony instruction.[6] *Washington* and *Ross* lead us to the conclusion that, regardless of whether a party requested the lesser included instruction or it was given sua sponte, the relevant inquiry is whether the instruction was properly given pursuant to the *Wright* analysis.[7]

---

[6] In *Ross*, the trial court proposed giving a voluntary manslaughter instruction. The State did not object, but Ross's counsel did, asserting there was no evidence of sudden heat. The trial court overruled this objection and gave a pattern jury instruction for both Class A felony and Class B felony voluntary manslaughter. Trial counsel did not lodge a separate objection to the inclusion of Class A felony voluntary manslaughter in the instruction.

[7] In *Young v. State*, 30 N.E.3d 719, 728 (Ind. 2015), the Court addressed the principle that defendants must have "fair notice" of the charges of which they may be convicted, including inherently or factually included lesser offenses. There, two defendants were charged with murder by a shooting, and at the conclusion of the evidence at the bench trial, the trial court found that the evidence showed that defendants had planned a group beating of the victim but that there was insufficient evidence that defendants knew any member of the group would shoot the victim. The court dismissed the murder charges but left "all the possible batteries on the table" as lesser included offenses -- although neither party had requested consideration of such. *Id.* at 721. Following argument, the court found the defendants guilty of Class B felony attempted aggravated battery for planning the beating. On transfer, our Supreme Court observed that the inherent and factual inclusion tests established in *Wright* "are a necessary piece of the larger fair-notice puzzle" but are not always dispositive, concluding that "fair notice" was lacking in that case because, although the elements of attempted aggravated battery were inherently included in murder, the convictions were based on a

[30] In further support of his position, Jackson makes the broader policy argument that if a trial court sua sponte instructs a jury on a lesser included offense, over a defendant's objection, the court fails to act in an impartial manner because the court is interfering with a party's strategic maneuvering. His argument in that regard is not lost on us. Clearly, giving a lesser included instruction can affect a defendant's desire to pursue an all-or-nothing trial strategy.

[31] Our Supreme Court recognized this consequence in *Watts.* There, the Court determined that defense counsel's objection to a voluntary manslaughter instruction should have been sustained because there was no serious evidentiary dispute over sudden heat. In its decision, the Court expressly acknowledged that lesser included instructions may detrimentally affect a defendant's trial strategy:

> One legitimate trial strategy for the defendant in a murder trial is an "all-or-nothing" one in which the defendant seeks acquittal while realizing that the jury might instead convict of murder. In a situation where a jury must choose between a murder conviction and an acquittal, the defendant might well be acquitted. But if the jury has voluntary manslaughter as an intermediate option, the defendant might be convicted of voluntary manslaughter as a "compromise." Such a verdict is not appropriate *if unsupported by any evidence of sudden heat*; moreover, an *unsupported* voluntary manslaughter instruction

completely different "means used" (beating) than was alleged in the charging informations (shooting). *Id.* at 728. While Jackson does not raise a fair notice argument, we find that *Young*'s discussion of *Wright* nevertheless informs our decision today, as it reflects that the *Wright* test is applicable in situations where the trial court acts sua sponte to propose consideration of lesser-included offenses.

deprives the defendant of the opportunity to pursue a legitimate trial strategy.

885 N.E.2d at 1233 (emphases added).

[32] A few years later, this court, in *True v. State*, 954 N.E.2d 1105 (Ind. Ct. App. 2011), addressed the propriety of an instruction for Class A misdemeanor battery as a lesser included of Class D felony domestic battery, being given at the State's request and over the defendant's objection. The *True* court echoed the *Watts* Court's observations regarding the potential impact of a lesser included instruction on a defendant's "all or nothing" strategy, stating that "such a defense can be improperly undermined by the State obtaining a lesser included offense instruction *where the evidence does not warrant such an instruction*[.]" *Id*. at 1110 (emphasis added). The *True* court continued that, under *Watts*, "neither the State nor a defendant may seek to have a jury enter a 'compromise' verdict, based on the giving of a lesser included offense instruction *that is not supported by the evidence*." *Id*. (emphasis added). Because there was no serious evidentiary dispute as to whether the battery was committed in the presence of children (required by the Class D felony), the *True* court found that the instruction "improperly invited the jury to reach a 'compromise' verdict." *Id*. at 1111. *Watts* and *True* suggest to us that it is when a lesser included instruction is not supported by the evidence that a defendant is *improperly* deprived of his choice to pursue an all-or-nothing strategy.

[33] Granted, in *Watts* and *True*, the State had made the request that the court give a lesser included instruction, making it distinguishable from here, where the

instruction was given sua sponte. However, the common thread woven throughout the cases, including when a lesser included instruction was given sua sponte, is whether – pursuant to the *Wright* analysis – a serious evidentiary dispute existed on the element distinguishing the lesser and greater offenses.

[34] In sum, we agree with the State that, while trial courts are not required to give an instruction on a lesser included offense sua sponte, they are not precluded from doing so given the proper circumstances. Here, the trial court found, and it is undisputed, that a serious evidentiary dispute existed as to Jackson's mens rea, that is, the distinguishing element between the charged attempted murder and the lesser aggravated battery. For the reasons discussed above, we find the trial court did not err in instructing the jury on aggravated battery.

## II. Self Defense Instruction

[35] Jackson next claims that the trial court erred when it refused one of his tendered self-defense instructions. This Court reviews a trial court's manner of instructing the jury for an abuse of discretion. *Treadway v. State*, 924 N.E.2d 621, 636 (Ind. 2010). When reviewing a trial court's refusal to give an instruction, the reviewing court looks to whether the tendered instruction correctly states the law, whether there is evidence in the record to support giving the instruction, and whether the substance of the proffered instruction is covered by other instructions. *Id*.

[36] "To employ self-defense, 'a defendant must satisfy both an objective and subjective standard: he must have actually believed deadly force was necessary

to protect himself, and his belief must be one that a reasonable person would have held under the circumstances.'" *Passarelli v. State*, 201 N.E.3d 271, 276 (Ind. Ct. App. 2023) (quoting *Littler v. State*, 871 N.E.2d 276, 279 (Ind. 2007)), *trans. denied*. Here, the trial court gave Final Instruction 3[8] concerning self-defense, which was based on pattern jury instruction 10.03.[9] No party objected to Final Instruction 3. However, as is relevant to this appeal, Jackson asked the court to also give his Defense Instruction 6, which the court refused. It stated:

> With regard to the defense of self-defense, the existence of the danger, the necessity or apparent necessity of using force, as well as the amount of force required to resist the attack or criminal

---

[8] Final Instruction 3 read:

> It is an issue in this case as to whether the defendant acted in self-defense.
>
> A person may use reasonable force against another person to protect himself from what he reasonably believes to be the imminent use of unlawful force.
>
> A person is justified in using deadly force, and does not have a duty to retreat, only if he reasonably believes the deadly force is necessary to prevent serious bodily injury to himself or the commission of a forcible felony. [H]owever, a person may not use force if:
>
>> (1) he is committing a crime that is directly and immediately connected to the confrontation between the defendant and Adrian Taylor;
>>
>> (2) he is escaping after the commission of a crime that is directly and immediately connected to interaction between the defendant and Adrian Taylor;
>>
>> (3) he provokes a fight with another person with intent to cause bodily injury to that person or;
>>
>> (4) he has willingly entered into a fight with another person or is the initial aggressor, unless he withdraws from the encounter and communicates to the other person the intent to do so and the other person nevertheless continues or threatens to continue the fight.
>
> The burden is upon the state to disprove this defense beyond a reasonable doubt.

> *Appendix* at 122-23.

[9] Our Supreme Court has stated, "Although we have not formally approved [Indiana Pattern Jury Instructions] for use, we have recognized their existence and given them some preferential status." *Clay City Consol. Sch.. Corp. v. Timberman*, 918 N.E.2d 292, 295 (Ind 2009).

interference with property *can only be determined from the standpoint of the defendant at the time and under the then existing circumstances.*

Ordinarily, one exercising the right to self-defense is required to act upon the instant and without time to deliberate and investigate, and under such circumstances a danger which exists only in appearance, is as real and imminent to him as if it were actual.  A person has a right to act upon appearances of actual and immediate danger if they sincerely believe such apparent danger exists.  A person's belief of apparent danger does not require the danger be actual, but only that the belief be in good faith.  It need be only apparent to a reasonable person under the then existing circumstances of the defendant.

*A defender will not be accountable for an error in judgment as to the amount of force necessary, provided they acted honestly.  The law protects persons who feel compelled to act at such times even though in retrospect may prove they have erred.*

The defendant's perception and belief must be subjectively [made] in good faith and objectively one that a reasonable person would have under the same circumstances of the defendant, at the time.

Authority:  <u>French v. State</u>, 403 N.E.2d 821 (Ind. 1980).

*Appendix* at 117 (emphases added).  The trial court refused this tendered instruction on the basis that our Supreme Court had found certain language in it to be "not necessary" and "misleading."  *Transcript Vol. 3* at 143-44.

[37]     Jackson claims that the court's Final Instruction 3 "did not address consideration of danger from the defendant's standpoint or that the defendant is

entitled to a mistake in judgment if he acted honestly." *Appellant's Brief* at 35. In *Washington v. State*, 997 N.E.2d 342 (Ind. 2013), a defendant similarly claimed that the trial court erred in failing to give his proposed instruction that focused on the standpoint of the person experiencing the danger and stated that the person would not be accountable for an error in judgment, provided he acted honestly. In reviewing whether the trial court was required to use the defendant's proposed final instruction, the *Washington* Court held that it was not, as the additional language in the instruction was "superfluous." *Id.* at 350.

[38] Furthermore, our court, in *Passarelli,* recently confirmed that the objective component of self-defense, as adopted by our courts, is analyzed from the standpoint of an ordinary "reasonable person." 201 N.E.3d at 279. There, we explained,

> the question being presented to the jury is whether an ordinary reasonable person would have responded with deadly force if confronted with the same circumstances that [the defendant] confronted. The issue is not whether a person just like Passarelli—who also suffers from PTSD caused by military combat—would have responded as Passarelli did. In short, the standard of what constitutes an "ordinary man" does not change on a case-by-case basis.

*Id.* at 278-79. To the extent that Jackson's Defense Instruction 6 asked the jury to consider otherwise, it was not a correct statement of the law.

[39] Jackson also complains that the trial court's Final Instruction 3 "does not explain that 'reasonably believes' encompasses a subjective and objective

standard like Jackson's tendered instruction." *Appellant's Brief* at 35.   However, in *Schermerhorn v. State*, this court addressed the propriety of a pattern self-defense jury instruction, largely the same as that before us, and found that it "sufficiently instructed the jury on both components."  61 N.E.3d 375, 383 (Ind. Ct. App. 2016) (stating that our Supreme Court, in *Washington*, determined that the jury instruction on self defense in that case, which tracked the court's jury instruction in Schermerhorn's case with respect to a defendant's reasonable belief in the use of imminent unlawful force, sufficiently instructed the jury on both the subjective and objective components), *trans. denied*.

[40]   Jackson has failed to establish that the trial court abused its discretion in instructing the jury on self-defense.

## III.  Admission of Evidence

[41]   Jackson asserts that the trial court erred when it admitted, over his objections, (1) the second portion of Exhibit 15, Officer Tatomirovich's body cam footage showing Taylor in the backseat of the car until medical personnel arrived, and (2) Exhibit 23, the recorded interrogation up through the point when the detective completed his questioning and left the room but not including statements Jackson made while left alone in the room.

[42]   The admission and exclusion of evidence is within the discretion of the trial court.  *Jackson v. State*, 973 N.E.2d 1123, 1127 (Ind. Ct. App. 2012), *trans. denied*.  An abuse of discretion occurs when the trial court's decision is clearly against the logic and effects of the facts and circumstances before it.  *Id*.

*Exhibit 15*

[43] Jackson asserts that the second portion of Exhibit 15, which included images of Taylor in the vehicle and then struggling to stand, should not have been admitted because it was "overly prejudicial and cumulative of other evidence" and "likely [] inflamed the jury's sympathy for Taylor[.]" *Appellant's Brief* at 36, 39. Relevant evidence can be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice." Ind. Evidence Rule 403. As our courts have observed, "[A]ll relevant evidence is 'inherently prejudicial' in a criminal prosecution, so the inquiry boils down to a balance of probative value against the likely unfair prejudicial impact the evidence may have on the jury." *Carter v. State*, 766 N.E.2d 377, 382 (Ind. 2002). When determining the likely unfair prejudicial impact, courts will look for the dangers that the jury will substantially overestimate the value of the evidence or the evidence will arouse or inflame the passions or sympathies of the jury. *Id.* "'Unfair prejudice . . . looks to the capacity of the evidence to persuade by illegitimate means, or the tendency of the evidence to suggest decision on an improper basis.'" *Hall v. State*, 177 N.E.3d 1183, 1193 (Ind. 2021) (quoting *Camm v. State*, 908 N.E.2d 215, 224 (Ind. 2009)).

[44] Jackson argues that Officer Tatomirovich's testimony of her observations of Taylor when she arrived on scene in conjunction with the surgeon's testimony of Taylor's condition at the hospital would have been sufficient to show the deterioration of Taylor's condition. We have recognized, however, that "[g]enerally, photographs that depict a victim's injuries or demonstrate the

testimony of a witness are admissible.'" *Jackson*, 973 N.E.2d at 1127 (quoting *Ward v. State*, 903 N.E.2d 946, 958 (Ind. 2009)). "Even gory and revolting photographs may be admissible as long as they are relevant to some material issue or show scenes that a witness could describe orally." *Id*. (quoting *Amburgey v. State*, 696 N.E.2d 44, 45 (Ind. 1998)).

[45] Furthermore, as the State argued at trial, the portion of the bodycam that Jackson sought to exclude served to connect the dots, so to speak, between the surveillance video, where Taylor was seen after the stabbing talking and walking out of the building – such that his injuries did not appear severe – and the surgeon's testimony that Jackson was near death by the time he arrived at the hospital. The challenged portion of Exhibit 15 thus had probative value, and while it showed his deteriorating condition – clearly in physical distress and needing considerable assistance to get out of the car and on the stretcher – the footage was not particularly graphic or gruesome. Jackson has not persuaded us that the trial court abused its discretion by admitting Exhibit 15.

### Exhibit 23

[46] Jackson asserts that Exhibit 23 improperly "cut out the portion of the interview when Detective Shaffer left Jackson alone in the room and Jackson began talking to himself about the incident" and that the excluded portion of the recording should have been admitted under the doctrine of completeness, embodied in Ind. Evid. Rule 106. *Appellant's Brief* at 39. Evid. R. 106 provides:

> If a party introduces all or part of a writing or recorded
> statement, an adverse party may require the introduction, at that

time, of any other part--or any other writing or recorded statement--that in fairness ought to be considered at the same time.

The purpose of the doctrine of completeness "is to provide context for otherwise isolated comments when fairness requires it." *Sanders v. State*, 840 N.E.2d 319, 323 (Ind. 2006). It is "designed to avoid misleading impressions caused by taking a statement out of its proper context or otherwise conveying a distorted picture by the introduction of only selective parts of a statement." *Barnett v. State*, 916 N.E.2d 280, 286 (Ind. Ct. App. 2009), *trans. denied*. He argues that "[i]t was necessary for the jury to see the entire interview to insure a fair and impartial understanding of the admitted portion[.]" *Appellant's Brief* at 40.

[47] Here, we find no error for a couple of reasons. First, to the extent that Jackson argues that what was excluded was a portion of the interview and "an extension of [his] confession," *Appellant's Brief* at 39, we disagree. Detective Shaffer did not leave and return. Rather, he completed his questioning and left. The interview had concluded. On these facts, the trial court did not abuse its discretion in concluding that Evid. R. 106 did not require admission of the recorded segment at issue.

[48] Second, although the trial court declined to admit the recording of Jackson talking to himself under the doctrine of completeness, the court stated that Jackson's "volunteered statements" after the detective left the room "do reflect [Jackson's] state of mind," and if Jackson wished to present that portion of the

recording in his case-in-chief, he could do so. *Transcript Vol. 3* at 139. He did not, and therefore he has no cause to complain.

[49] Accordingly, Jackson has not established that the trial court abused its discretion in admitting Exhibit 23, which did not include Jackson's statements made after the detective concluded his questioning and left the room.

[50] Judgment affirmed.

May, J. and Foley, J., concur.